[No. 10988. *En Banc.* February 20, 1914.]

SEATTLE ELECTRIC COMPANY, *Respondent*, v. THE CITY OF SEATTLE et al., *Appellants*.[1]

MUNICIPAL CORPORATIONS—CONSTITUTIONAL LAW—POLICE POWERS. The right of a city to exercise the police power within its limits by regulations not in conflict with general laws, given by Const., art. 11, § 11, ceases as to any particular subject-matter when the state acts by passing a general law on the subject, unless there is room for the exercise of concurrent jurisdiction.

MUNICIPAL CORPORATIONS—POWERS—STREET RAILWAYS — REGULATION—POLICE POWER—DELEGATION. The public service commission law, 3 Rem. & Bal. Code, § 8626-1 *et seq.*, empowering the public service commission to regulate and control street railways, revokes the power of a city, after the taking effect of the law, to legislate upon the subject of overcrowding the street cars, or operating in accordance with specified schedules, and vests the same in the pub-

[1]Reported in 138 Pac. 892.

lic service commission; in view of the comprehensive terms of the law, making the same include the regulation of any service (used in its broadest sense) in connection with the safety, comfort and convenience of persons transported, either upon its own motion or upon the complaint of any person, commission, board, or any municipal corporation; the intent that the city should not retain the power until the public service commission had acted being evident from the failure to exempt street railways within city limits, and the giving of a city the right to invoke the aid of the commission.

Appeal from a judgment of the superior court for King county, Albertson, J., entered December 12, 1912, in favor of the plaintiff, in an action for an injunction, tried to the court. Affirmed.

*James E. Bradford* and *Ralph S. Pierce*, for appellants.

*James B. Howe* and *Hugh A. Tait*, for respondent.

MAIN, J.—This action was begun for the purpose of securing injunctive relief.

The plaintiff is a public service corporation, owning and operating a street railway system in the city of Seattle, over approximately one hundred and eighty miles of track, under and by virtue of franchises granted by such city. The defendant city is a municipal corporation of the first class.

During the month of October, 1911, the city council of the city of Seattle passed an ordinance for the purpose of regulating the operation of electric street cars. The object of this ordinance was two-fold: First, prevention of overcrowding of the cars; and second, to secure their operation in accordance with a schedule to be filed in the office of the superintendent of public utilities of the city. Thereafter, and on November 16, 1911, the present action was instituted for the purpose of enjoining the defendants from enforcing, or attempting to enforce, the ordinance. After issue was joined, the cause in due time came on for trial in the superior court. A judgment was entered enjoining the defendants from enforcing the ordinance. The present appeal is prosecuted from that judgment.

The sole question to be determined is whether the ordinance is a valid enactment. For the purposes of the present decision, it will be assumed that the city council had the power and authority to pass the ordinance in question, unless such power has been withdrawn from it by the provisions of what is known as the public service commission law, passed at the legislative session for the year 1911. Laws of 1911, ch. 117, p. 538 (3 Rem. & Bal. Code, § 8626-1 *et seq.*). The provisions of this law which are here material are as follows:

"The term 'common carrier' when used in this act, includes all railroads, railroad companies, *street railroads, street railroad companies* . . . owning, operating, managing or controlling any such agency for public use in the conveyance of persons or property for hire within this state." Page 543, § 8; Id., § 8626-8.

"The term 'transportation of persons' when used in this act, includes *any service* in connection with the receiving, carriage and delivery of the person transported and his baggage, and all facilities used, or necessary to be used in connection with the safety, comfort and convenience of the person transported.

"The term 'service' is used in this act in its broadest and most inclusive sense." Page 544; Id., §8626-8.

"Whenever the commission shall find, after such hearing, that the rules, *regulations*, practices, equipment, appliances, facilities, or service, of any such common carrier in respect to the transportation of persons or property are unjust, unreasonable, unsafe, improper, inadequate or insufficient, the commission shall determine the just, reasonable, safe, adequate, sufficient and proper rules, *regulations*, practices, equipment, appliances, facilities or service to be observed, furnished, constructed or enforced and be used in the transportation of persons and property by such common carrier, and fix the same by its order or rule as hereinafter provided." Page 571, § 53; Id., § 8626-53.

"Complaint may be made by the commission of its own motion or by any person or corporation, chamber of commerce, board of trade, or any commercial, mercantile, agricultural or manufacturing society, or any body politic or *municipal corporation*, by petition or complaint in writing,

setting forth any act or thing done or omitted to be done by any public service corporation in violation or claimed to be in violation, of any provision of law or of any order or rule of the commission." Page 592, § 80; Id., § 8626-80.

It will be noted that, by this statute, it is provided: That the term "common carrier" shall include street railroads and street railroad companies; that the term "transportation of persons" includes any service in connection with the receiving, carriage and delivery of persons transported, and all facilities used or to be used in connection with the safety, comfort and convenience of the persons transported; that the term "service" is used in its broadest and most inclusive sense; that, when the commission (public service commission) shall find, after hearing, that the rules, regulations, etc., of any common carrier in respect to the transportation of persons or property are unjust, unreasonable, unsafe, improper, inadequate or inefficient, the commission shall determine the just, reasonable, safe and proper rules, regulations, etc.; and that complaint may be made by the commission of its own motion, or by any person or corporation, chamber of commerce, board of trade, or any commercial, mercantile, agricultural or manufacturing society, or any body politic or municipal corporation.

The appellants concede that these provisions of the law endow the public service commission with power to regulate and control street railways. But it is contended that, until such time as the public service commission shall act, the city council retains jurisdiction to regulate street railways as to the number of passengers which a car may carry and the schedule in accordance with which cars shall be operated. In other words, the city may act until the public service commission shall have acted; but, when the latter has issued an order covering the same subject-matter, then the action of the city council becomes nugatory and of no force and effect.

The respondent contends that the public service commis-

sion law vested in the public service commission jurisdiction over all matters covered by the ordinance, and any previous delegation of power to the city over the same subject-matter was thereby revoked; or, to state it in another way, that the jurisdiction of the city as to such matters was divested by the enactment of the statute, and subsequent to the time when the statute went into effect, the city had no power to act; and since the ordinance was enacted subsequent to the time when the law took effect, the city acted without power and the ordinance was therefore void.

The ultimate question to be determined, then, is whether the public service commission law revoked the power of the city to legislate upon the subject-matter of the ordinance at the time the law took effect, or does the city retain such power until the public service commission shall issue an order covering the same subject-matter.

Section 10 of article 11 of the state constitution provides that any city containing a population of 20,000 inhabitants or more shall be permitted to frame a charter for its own government "consistent with and subject to the constitution and laws of this state."

Section 11 of the same article provides: That any county, city, town or township may make and enforce within its limits all such local, police, sanitary and other regulations as are "not in conflict with general laws."

In *State ex rel. Webster v. Superior Court*, 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913 D. 78, it was held that these two sections of the constitution were subject to the same interpretation. It was there said:

"This section [11] is subject to the same interpretation as § 10, and under it a general law becomes controlling. The words 'not in conflict with general laws,' as there employed, do not mean that municipal regulations passed in the absence of general laws foreclose the right of the state to assert its sovereignty, but merely that the police power may be exercised until such time as the state acts. They must then give way to the general law. If, by its inaction, the state has per-

mitted a municipality to assume and exercise its police power, it is not foreclosed of its right, if the legislature afterwards sees fit to exercise it. Cooley, Const. Lim. (7th ed.), p. 279. Under this rule, concurrent jurisdiction over crimes has been sustained. But where the state, as has this state, asserted its jurisdiction over a given subject-matter, and there is no room for concurrence, the municipal charter or ordinance must give way."

It is apparent that the court there plainly held that the right of the city to exercise the police power over a particular subject-matter ceases when the state acts upon the same subject-matter, unless there is room for the exercise of concurrent jurisdiction. That a state acts when a law passed by the legislature takes effect can hardly be doubted. In the case of *Northern Pac. R. Co. v. State of Washington ex rel. Atkinson,* 222 U. S. 370, the Federal supreme court had before it substantially this state of facts: On March 4, 1907, an act of Congress known as the "hours of service" law, was approved (34 Stat. 1415). This law contained a provision to the following effect: "This act shall take effect and be in force one year after its passage." On June 12, 1907, a law of the state of Washington (Laws of 1907, p. 25, ch. 20; Rem. & Bal. Code, § 6581 *et seq.*), regulating the hours of service of railway employees, became effective. On July 3d and 4th, 1907, the Northern Pacific Railway Company, in operating a train on its road in the state of Washington, permitted some of the train crew to remain on duty more than sixteen consecutive hours, and thereby offended against the law of the state which became effective on June 12th. The question was whether the right of the state to apply its police power for the purpose of regulating interstate commerce in a case like this was terminated when the act of Congress covering the same subject-matter was approved, or when, by its terms it was to take effect one year later. The court there, after reviewing the decision of this court which sustained the right to proceed under the state statute until the act of Congress should take effect, said:

"But we are of opinion that this view is not compatible with the paramount authority of congress over interstate commerce. It is elementary, and such is the doctrine announced by the cases to which the court below referred, that the right of a state to apply its police power for the purpose of regulating interstate commerce, in a case like this, exists only from the silence of congress on the subject, and ceases when congress acts on the subject or manifests its purpose to call into play its exclusive power. This being the conceded premise upon which alone the state law could have been made applicable, it results that as the enactment by congress of the law in question was an assertion of its power, by the fact alone of such manifestation that subject was at once removed from the sphere of the operation of the authority of the state. To admit the fundamental principle and yet to reason that because congress chose to make its prohibitions take effect only after a year, the matter with which congress dealt remained subject to state power, is to cause the act of congress to destroy itself; that is, to give effect to the will of congress as embodied in the postponing provision for the purpose of overriding and rendering ineffective the expression of the will of congress to bring the subject within its control—a manifestation arising from the mere fact of the enactment of the statute."

The right of the city to exercise the police power within its corporate limits given to it by constitutional grant may not present a situation exactly parallel to the right of the state to exercise jurisdiction for the purpose of regulating interstate commerce, which exists only by virtue of the silence of congress. In one case, there is an affirmative declaration of power by the fundamental law of the state. In the other, there is only a negative power which exists until congress shall speak upon the subject. But, notwithstanding this difference, it is plain that the state must be held to have spoken upon a given subject-matter when its legislative will becomes effective. From that time, the policy of the state is declared. But if there is room for the exercise of concurrent jurisdiction, the act of the state legislature does not revoke the right of the city to exercise the police power.

The inquiry then must be directed to the question as to whether the legislature intended that the city should exercise its police power over the subject-matter of the ordinance after the public service commission law took effect and prior to the time that the public service commission might issue an order.

The public service commission law of this state was substantially taken from the Wisconsin law. This fact is conceded by both the appellants and the respondent. The Wisconsin law contained a provision that the act should not apply to street and electric railroads engaged solely in the transportation of passengers within the limits of cities. In the law of this state, we find no such provision. The terms of the law, as shown by the excerpts already quoted, are most comprehensive. The appellant concedes that these provisions invest the public service commission with the right to control street railways by the issuance of an order after a hearing, and also the right of the city to invoke the aid of the commission in regulating and controlling street railways operating within its limits. Had the legislature intended that the city might exercise jurisdiction until the commission should issue an order, it seems strange that, with the Wisconsin law before it, with a provision therein exempting certain street and electric railroads from its operation, that some qualification would not have been inserted in the law of this state.

Again, if it was the legislative will that jurisdiction should be retained by the city, the insertion in the law of the right of the city to invoke the aid of the commission would be entirely useless. To so construe the law that the city might exercise the power of regulation until the public service commission should act, would be of no substantial benefit to the city and would give rise to conflict of authority and inevitable confusion. If this were the meaning of the law, the city, after it had gone to the trouble and expense of acquiring the necessary data and passing a regulating ordinance, might have its work nullified whenever, to use the language of the statute,

complaint might be made to the commission by "any person, corporation, chamber of commerce, board of trade, or any commercial, mercantile, agricultural or manufacturing society, or any body politic or municipal corporation," and the commission should issue an order.    And the public utilities company, if it should comply with the ordinance and incur expenses necessarily incident thereto, might have its work undone in like manner.

Considering the entire statute, and especially the excerpts quoted therefrom, it seems plain to us that it was the legislative intent that the power and authority to regulate public utilities was vested in the public service commission from and after the time the law took effect; and that, when the law became effective, it revoked the power of the city to legislate upon the subject-matter covered by the ordinance.

Two cases are called to our attention by counsel for the appellant which it is claimed sustain his view.    They are, *Charleston Consol. R. & Lighting Co. v. City Council of Charleston*, 92 S. C. 127, 75 S. E. 390, and *City of Manitowoc v. Manitowoc & Northern Traction Co.*, 145 Wis. 13, 129 N. W. 925, 140 Am. St. 1056.    In the *Charleston* case, the city had granted a gas franchise, and in the franchise the right to fix the rate to be charged for light, heat, and power furnished to the city and its citizens was reserved to the city council. Thereafter the legislature of the state of South Carolina passed a law providing for the regulation of rates by a commission.    The lighting company contended that this law abrogated the right of the city to fix the rate which had been reserved in the franchise.    The decision in that case was rendered by a single justice, and it was held that "until the commission had exercised its power to fix a different rate, that provided by the contract stands."

In the *Manitowoc* case, a franchise had been granted by the city to the traction company in which the rate of fare to be charged between the cities of Manitowoc and Two Rivers was fixed at ten cents.    Subsequently the legislature of the

state of Wisconsin passed a public utilities law which provided that rates might be fixed by a commission therein provided for. The traction company claimed that the rate of ten cents was not compensatory, and that the public utilities law giving the right to the commission to fix rates had abrogated its contract rate with the city, and sought to increase the rate from ten cents to fifteen cents. The city brought an action to restrain such increase. The court there held that the rates fixed in the franchise, being a contractual rate, it was not modified until the commission should act and fix a different rate.

Both of these cases are founded upon the proposition that a contract between a city and a public utility is not abrogated when a public utilities law goes into effect giving a commission the right to fix the rates, but that the contract rate remains until such time as the commission provides for a different rate. The distinction between those cases and the present case is that there, there was a definite contract in each case, while here, the city of Seattle did not retain by contract the right to exercise the power which it sought to exercise by the ordinance, but claims the right to exercise it under the police power of the city.

While the passage of a public utilities law does not abrogate contracts until the commission has fixed a different rate, it does not follow that the passage of a public utilities law may not withdraw from the city the right to exercise the police power from and after the date it became effective. This distinction was recognized in the *Manitowoc* case, where it was said:

".If, as is contended by counsel for the respondent, no contract was entered into and we were dealing with the ordinance as a legislative enactment pure and simple and not as part and parcel of a contract, there might be good reason for the claim that it is superseded by ch. 362, Laws of 1905, without any affirmative action on the part of the railroad commission."

It has been stated by respectable authority that the grant of power to a municipal corporation does not permit it to adopt by-laws which infringe the spirit or are repugnant to the policy of the state as declared in its general legislation. In 2 Dillon, Municipal Corporations (5th ed.), § 601, it is said:

"The rule that a municipal corporation can pass no ordinance which conflicts with its charter, or any general statute in force and applicable to the corporation, has been before stated. Not only so, but it cannot, *in virtue of its incidental power* to pass by-laws, or under any general grant of that authority, adopt by-laws which infringe the spirit or are repugnant to the policy of the state as declared in its general legislation. . . ."

Some mention has been made of the right of the city to control the use of its streets. But obviously that question is not involved in this proceeding. Neither can we here consider the wisdom of the public service commission law. If the law is unwise or unjust in its operation, resort must be had to the legislative branch of the government to change it. It is our duty to construe the law as we find it.

The judgment will be affirmed.

CROW, C. J., MOUNT, GOSE, CHADWICK, and FULLERTON, JJ., concur.

ELLIS, J. (concurring)—The conclusion reached by the majority seems inevitable in view of the decision in *State ex rel. Webster v. Sup'r Ct.*, 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913 D. 78. The cases cannot be logically distinguished. I joined in the dissenting opinion in that case and still believe that it expresses the sounder view. But since the majority opinion in that case has become the settled law of the state, I am constrained to concur in the result reached by the majority in this.

MORRIS, J., concurs with ELLIS, J.

PARKER, J. (concurring)—I concur in the result reached by my brethren, in view of the fact that the regulations here involved, which are sought to be enacted in the form of a city ordinance, have to do solely with the overcrowding of street cars and their operation in accordance with schedules to be filed with the city authorities. I entertain some fears, however, that the court's opinion may create the impression that the city has, by the public service commission law, been shorn of its police power to a greater extent than I am ready to concede that law has accomplished. It seems to me that there are many possible police regulations which the city may enact in the form of ordinances looking to the welfare and safety of the public, to which a street railway company would be subject, as well as others, notwithstanding the existence of the public service commission law.