Jones, J.,
dissenting.
Whether prohibition can be invoked in this case depends upon the decisive question, which of these contending tribunals has *197 jurisdiction over the rates of this public utility — the common pleas court of Cuyahoga county or the public utilities commission of the state? If the former has no jurisdiction over the subject-matter, a writ of prohibition should issue; and upon the decision of this feature of the case rests the determination as to the character of the remedy. Upon this phase of the question I fully concur with the views of the concurring judge. Herein lies the crux of this remedial controversy. The Cuyahoga county common pleas court decided that the public utility act did not control. If its decision was erroneous, then that court clearly usurped jurisdiction and should be prohibited from further entertaining it. This is the province of the writ. What boots it to the city if we now deny the writ, and later on gibbet the city by holding that the public utilities commission had complete jurisdiction? Here the telephone company is being subjected by the commission, on the one hand, to a statutory investigation of-its rates; on the other hand a court acting solely under a statutory jurisdiction is also assuming jurisdiction and threatens to impose the ordinance rates upon the utility. Which of these tribunals has jurisdiction over the subject-matter? To which must the utility yield? Shall it be subjected, as it now is, to a two-fold simultaneous hearing? And, at the conclusion of those hearings, whose orders shall it obey? Shall it subject itself to punishment for contempt for failure to obey the order of the Cuyahoga county court, or submit to a maximum penalty of $1,000 per day for failure to obey the order of the commission as provided by *198 the code? (Section 614-64, General Code.) The situation is preposterous. How futile and how fatuous it would be to have these contending cases pursue their tedious course through the intervening courts, on error, in order to determine ultimately in this court the sole decisive question — Has the nisi prius court jurisdiction and has the legislature conferred it ? And now, both sides having trained their heavy guns on the main question and being desirous of a determination, we find ourselves in the situation described by the Latin poet:

“Parturiunt montes,

“Nascetur ridiculus mus.”

As stated in the text of 2 Bailey on Habeas Corpus, 1398: “It being conceded that the very .object and purpose of the writ of prohibition is to confine courts, within their jurisdiction, to prevent them from exercising powers they do not possess, is it not a total disregard of such purpose to say and hold, that notwithstanding, the court shall not be restrained, but permitted to proceed and in the end, this exercise of the want of power, will be corrected and the proceeding declared non coram judice, and all at the expense and to the material injury of the party aggrieved?”
It has been held .even in cases where two tribunals of coordinate jurisdiction are simultaneously taking cognizance of the same subject-matter, under circumstances where their final judgments may clash in their execution, and the party aggrieved is subject to the expense of two separate trials upon the subject- of the controversy, that *199 error does not' furnish an adequate remedy and that prohibition would lie. State, ex rel. Webster, v. Superior Court of King Co., 67 Wash., 37.
The principle announced is also supported by the following cases: State, ex rel. Merriam, v. Ross, Judge, 122 Mo., 435; State, ex rel. Sullivan et al., v. Reynolds, Judge, 209 Mo., 161, and Dungan v. Superior Court of Fresno Co., 149 Cal., 98. In the latter case two superior courts of California counties were exercising jurisdiction in the settlement of an estate, and the court there held that the court first obtaining jurisdiction retained it, and prohibited the second coordinate court from exercising any jurisdiction therein. And in the opinion it was said at page 104: “In view of the complications which will necessarily follow the attempted exercise of jurisdiction in this matter by two superior courts, we are of the opinion that it cannot be said that there is a plain, speedy, and adequate remedy in the ordinary course of law.”
But it is stated that the courts of common pleas of this state are courts of general jurisdiction and competent to decide upon their own jurisdiction. No one questions this established principle, but the complete answer to that proposition is that if the court of common pleas either lacks jurisdiction, or usurps it, the writ will lie; otherwise we can have no writ of prohibition against any court of general jurisdiction in this state. Of course if the jurisdiction of the court depends Upon a controverted fact necessary to give it jurisdiction, the establishment of that fact by a court which is competent to decide it precludes a superior court from issuing the writ,
*200 but, as stated in State, ex rel. Barbee, v. Allen, Probate Judge, 96 Ohio St., 10, 15, in such cases the subject-matter “was one properly before the court and within its constitutional jurisdiction.”
Such is the effect of the decision in the case of Kelley, Judge, v. The State, ex rel. Gellner, 94 Ohio St., 331. In that case a writ of prohibition was asked for two reasons: (a) That the insolvency court had no jurisdiction over the subject-matter; (b) That the insolvency court had nó jurisdiction because the evidence failed to show that the plaintiff had been a resident of the state for a year preceding' the time of filing his petition. The court there held that the insolvency court had jurisdiction of the subject-matter, and, as to the second proposition involved, held that it was within the province of the insolvency court to determine the issue of fact. As to that feature the court was competent Ao pass upon its own jurisdiction, and error would lie.
To deny the writ of prohibition against a usurping court of general jurisdiction for the reason that such court is competent to pass upon its own jurisdiction would result in the adoption of a novel principle in the law relating to the issuance of this writ. Suppose such court should erroneously decide that it had jurisdiction of a subject-matter? Or, let it be assumed that the common pleas court of Cuyahoga county should attempt to issue a writ of prohibition or exercise original jurisdiction over the probate of wills or the settlement of decedents’ accounts, or that it should attempt to exercise original jurisdiction in the removal of a guardian *201 (which jurisdiction is denied in Guardianship of Oliver, 77 Ohio St., 474), and let it be further assumed that such court, as in this case, should endeavor to employ an injunctive writ in aid of its judgment in such cases, can it be claimed that because such court is competent to decide its own jurisdiction it is not subject to a writ of prohibition by the superior court, and that a litigant's remedy is by way of error only? An inspection of the syllabi of the Ohio cases clearly discloses that this writ is always available where these courts usurp jurisdiction, although they are competent to pass upon their own jurisdiction.
Is the subject-matter — the regulation of public utility rates and service — within the jurisdiction of the courts of common pleas of this state, or has that subject-matter been confined to the public utilities commission of the state? Section 614-3, General Code, provides: “The public service commission of Ohio is hereby vested with the power and jurisdiction to supervise and regulate 'public utilities' and 'railroads’ as herein defined and provided and to require all public utilities to furnish their products and render all services required by the commission, or by law.”
This provision of the act casts upon the commission full and complete jurisdiction over public utilities and their service. Section 4, Article IV, of the Ohio Constitution, provides that “The jurisdiction of the courts of common pleas, and of the judges thereof shall be fixed by law.” That these courts have no other jurisdiction than that fixed by legislative authority has been frequently decided in this *202 state. (Allen v. Smith, 84 Ohio St., 283.) Here the legislature of Ohio has not only withheld jurisdiction from the common pleas court, but has expressly denied its authority to interfere in any wise with the public utility commission and its orders, as disclosed by Section 549, General Code (103 O. L., 816), which is as follows: “No court other than the supreme court shall have power to review, suspend or delay any order made by the commission, or enjoin, restrain or interfere with the commission,” etc.
The prayer of the petition in the common pleas court was for injunctive relief, enjoining the telephone company from putting into effect the schedule of rates filed with the commission, and foi a mandatory injunction to install the ordinance rates. The granting of such order is tantamount to a writ of prohibition against the public utilities commission, prohibiting it from proceeding further as the statute provided. This was the practical and legal effect of the proceeding in the court of common pleas. Its judgment would necessarily nullify not only the statute of Ohio, but also the proceedings of the commission thereunder, and would be substantially a writ of prohibition, which under the constitution and laws of this state cannot be invoked in the common pleas court. Prior to the adoption of the present constitutional amendment appellate jurisdiction was given to the common pleas court over the final orders of these commissions. This appellate jurisdiction, however, has been repealed by the general assembly, and, in conformity with the constitutional requirement, it has *203 lodged all supervisory and appellate jurisdiction in the supreme court of this state. Section 544, General Code (103 O. L., 815), now provides that final orders made by the commission shall be reversed, vacated or modified by the supreme court, on a petition in error.
Thus it will be seen that all semblance of jurisdiction heretofore lodged in the court of common pleas, over the action of the public utilities commission, has been taken away from them by legislative enactment. Jurisdiction was retained in this case by the Cuyahoga county court expressly upon the principle announced by that court, to-wit, that the public utilities commission had no authority to act. The proceeding in the common pleas court was brought under the guise of restraining the telephone company, but its effect in contemplation of law was to restrain and interfere with the proceedings of the commission, in defiance of its orders, and an invocation of jurisdiction which had been expressly denied the lower courts.
That the writ of prohibition lies in cases where there is a want of or an excess of jurisdiction in an inferior tribunal has been established by the uniform decisions of the courts. 32 Cyc., 600, et seq.; State, ex rel. Nolan, v. ClenDening, 93 Ohio St., 264; State, ex rel. Garrison, v. Brough, 94 Ohio St., 115, and Kelley, Judge, v. The State, ex rel. Gellner, Id., 331.
Allusion has already been made to the case of State, ex rel. Webster, v. Superior Court of King Co., supra. The proceeding in that case followed exactly the proceeding in this. The injunction suit *204 was there brought against the company, at the instance of the city, to restrain the former from collecting the commission rates, and the company invoked the original jurisdiction of the supreme court in prohibition. The latter court held that the writ of prohibition was proper, the remedy by appeal inadequate, and awarded the writ against the superior court, prohibiting it from further proceeding in defiance of the order of the public utilities commission; and this the supreme court of Washington did, notwithstanding the fact that the injunction sought in the nisi prius court was not against the commission, but against the telephone company.
The writ of prohibition was therefore properly invoked in this case and should issue as prayed for. In compliance with the provisions of law the relator had filed its schedules of change of rates and rules of service. The commission having assumed jurisdiction was proceeding with an investigation and hearing as to the reasonableness of these rates when its authority was questioned by the injunction suit filed in the common pleas court of Cuyahoga county.
The second question presented in this case is succinctly stated in the brief of counsel for the city as follows: Has the city of Cleveland power, by virtue of the home-rule charter, to regulate telephone rates in the city, or is that power in the public utilities commission of Ohio?
The city of Cleveland has adopted a home-rule charter, under sanction of the Ohio Constitution, Article XVIII, Section 3, which is as follows: *205 “Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
It is now urged that this provision of the constitution has conferred upon the city a sovereign function, which theretofore adhered in the state, of enacting a charter authorizing it to regulate and establish rates for public utilities within municipal limits.
The cases heretofore decided, relating to the exercise of municipal home rule under charter provisions, are riot helpful in the disposition of this case. They merely establish the principle that matters which are purely municipal and governmental are controlled by the provisions of the constitution, above quoted, but that matters which are of state concern have not been placed within the absolute control of charter cities.
It must be conceded that there are no express or unequivocal terms in the constitution which would confer upon charter cities the right of regulation of public utilities. Is rate regulation of a utility, though its corpus may be confined within the city limits, a matter of municipal or state concern? That these public utilities are not mqrely of local concern, but are eo-related with state and national interests, is shown by the following excerpt from the President’s letter of February 19, 1918, to his Secretary of the Treasury:
“I fully share the views you express regarding the importance of the public service utilities as a *206 part of our national equipment, especially in wartime.- It is essential that these utilities should be maintained at their maximum efficiency and that everything reasonable should be done with that end in view.”
In the determination of this question it must be remembered that under the Ohio constitution these corporations secure their franchises from the state alone, and upon conditions prescribed by the commonwealth, which under the provisions of that instrument has the sole power of alteration or repeal of laws conferring corporate franchises. A home-rule city has no such constitutional power. If it is absolutely free from state control, as claimed, then it has the power of rate making and of conferring in perpetuity franchises which cannot be altered or repealed by the legislature under its reserved constitutional authority referred to.
The system of commission control over public utilities has been gradually developed and adopted by various states and by the national government. But, in every case, it is a system established and controlled by legislative authority of the sovereign — state and federal. The national control extends over the national domain; the state control extends over the state' domain. The latter may, it is true, divest itself of this sovereign function and yield it to a community therein, but its divestiture must be expressed in no uncertain terms, and must be clear and unambiguous. The rule of liberal construction 'does not apply. (State, ex rel. Toledo, v. Cooper, County Auditor, 97 Ohio St., 86.) Ohio never intended to emasculate the functions of the state and *207 place this paramount power in the hands of local communities.
Wherever the subject has been approached by the courts of this country, they have uniformly held that under charter provisions, adopted under home-rule amendments similar to our own, rate regulation is a matter of state-wide and not of municipal concern.
The supreme court of Oregon, in the case of Woodburn v. Public Service Commission, 82 Ore., 114, 125, speaking of that feature said: “The right to regulate rates is a matter of general concern, and does not pertain solely to municipal affairs * * * . The power to regulate rates does not pertain to the government of the city; it is not municipal in character; nor is it even an incident to a grant, of authority to enact or amend a charter for a city or town.”
In Portland Ry., Light & Power Co. v. City of Portland, 210 Fed. Rep., 667, 672, the federal judge said: “The regulation of fares to be charged by public service corporations is not primarily a municipal matter, but is a sovereign right belonging to the state in its sovereign capacity. All authority over the subject must emanate from the state. * * * If the [charter] amendment is valid and takes the public utilities within the city of Portland out 'of the operation of the Public Utility Act and the jurisdiction of the commission created by it, then every municipality in the state may amend its charter with like effect, and the Public Utility Act will become a useless and emasculated piece of legislation, the will of the *208 people as expressed therein be practically ignored, and the people of a part of the state become greater than the whole.”
The supreme court of thé state of Missouri in State, ex rel. Gardner, v. M. & K. Telephone Co., 189 Mo., 83, 84, held: “The regulation of price to be charged by a corporation intrusted with a franchise of a public utility, is not a power appertaining to the government of the city, and does not follow as an incident to a grant of power to frame a charter for the city government.”
There is a controlling reason why the home-rule charter did not control this public utility. The record discloses that The Cleveland Telephone Company was not only operating -within the municipal limits, but that its lines extended into Cuyahoga county and the counties adjoining. This utility was a corporate entity, and could not be dismembered at the city limits, since its operation and service extended not only throughout the city but throughout other portions of the state as well. In the extension of its commerce through its long-distance communications it not only reached' other communities, but was in fact compelled to connect with other lines extending throughout the state.
Section 614-63, General Code, empowered the state commission to effect continuous telephone line connections. Section 614-53, General Code, gave supreme control of its stocks and bond issues to the same authority.- Section 614-2, General Code, expressly denominated this utility as a common carrier. Section 9191, General Code, conferred upon it the sovereign power of eminent domain, *209 which has been upheld by the repeated decisions of this court. These various sections, including those sections of the General Code creating and granting the powers to the state public utilities commission, disclose that these various utilities have always been regarded as a matter of statewide concern.
Irrespective of what has been said, the present constitution of Ohio has expressly lodged the power of rate regulation in the legislature of this state. Section 2, Article XIII, provides: “Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed. Corporations may be classified and there may be conferred upon proper boards, commissions or officers, such supervisory and regulatory powers over their organisation, business and issue and sale of stocks and securities of foreign corporations and joint stock companies in this state, as may be prescribed by law”
This section of the constitution,- adopted on September 3, 1912, and at the same time the home-rule provision was adopted, expressly provides for legislative control. It authorizes the legislature to confer upon proper boards or commissions supervisory and regulatory powers over the organization and business of corporations of this character. There is no constitutional authority found in our constitution for municipal creation of any board for like purposes; and yet, if the contention of -the city be upheld, it has the right not only to regulate corporate organization and business, but to control the issue and sale of their stocks and securities. *210 If this constitutional provision means anything, it means that the sole power has been lodged in the general assembly. This construction was expressly recognized by the constitutional convention that submitted the amended section, for in its official address to the people of the state explaining the purport of the section the convention said:
“This amendment is offered for the purpose of authorizing legislation that will permit * * * the regulation by law of the * * * supervision over their [corporations] organization and business.”
Furthermore, that this section of the constitution and none other applied is disclosed by the adoption of the facsimile ballot containing the words, “Regulation of Corporations ” etc. At the election of September 3, 1912, over 300,000 electors approved this amended section, placing the regulation of corporate business in the hands of legislative boards and commissions. To thwart now this purpose, as clearly evinced not only by the section itself, but also in the official statement of its framers, would be tantamount to framing a constitution by the court.
The charter of the city of Cleveland provides that “the city * * * may acquire, construct,
own, lease and operate and regulate public utilities.” This went beyond the constitutional grant, which did not embody the word “regulate.”
Section 4, Article XVIII of the Constitution, provides that any municipality “may acquire, construct, own, lease and operate * * * any public utility,” etc.
*211 The utilization of these words excludes the power to regulate. Expressio unius est exclusio alterius.
The charter of the city government plainly incorporated a power not conferred by the provisions of the constitutional section above quoted.
The power attempted to be exercised by the city of Cleveland in the instant case is one of the police powers of the state, and remains therein, unless it has been unquestionably delegated by the state. We have already said that there are no clear or express terms found in our constitution conferring this sovereign function upon the city. The police power emanates from the welfare clause of the state and federal constitutions, and is based upon the principle that private property and corporations exercising public franchises or special privileges must submit their use to the control of the state for the common good. There is no question but that this is an exercise of the police power. Indeed, counsel for the city in their oral argument admitted it. It has been so recognized by every court which has had the subject under consideration. Yeatman v. Towers et al., 126 Md., 513; City of Benwood et al. v. Public Service Comm., 75 W. Va., 127; State, ex rel. Webster, v. Superior Court, 67 Wash., 37; Idaho Power & Light Co. v. Blomquist et al., 26 Idaho, 222; Seattle Electric Co. v. City of Seattle, 78 Wash., 203; Puget Sound Traction, Light & Power Co. v. Reynolds et al., 244 U. S., 574; Munn v. Illinois, 94 U. S., 113; Home Telephone & Telegraph Co. v. City of Los Angeles, 211 U. S., 265, and Lima Tel. & Teleg. Co. v. Public Utilities Commission, ante, 110.
*212 Recurring again to the home-rule constitution conferring police power upon charter cities, we find that provision limited by the following language : Section -3, Article XVIII. “Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict zvith general laws.”
In the present case, assuming that the charter city had the right to adopt this police regulation, the legislature, meanwhile, in conformity with its constitutional grant, had provided by general law for the creation of the public utilities commission and clothed it with supreme powers which are in direct conflict with the alleged power of rate regulation found in the city charter. In speaking of a police regulation adopted by the city of Fremont under authority of the quoted section, this court said in the case of City of Fremont v. Keating, 96 Ohio St., 468, 470: “This statute is a police regulation, and, under the section of the constitution above referred to, the municipality has the right to adopt and enforce within its limits police regulations in regard to the same subject-matter, not in conflict with this statute.”
The foregoing cases disclose that under constitutional provisions similar to our own other jurisdictions have subordinated the police power of rate fixing to the control of the various commissions established by legislative action.
Section 11, Article XI, of the Constitution of the state of Washington, provides that any city *213 “may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws.” This is substantially the language of the Ohio amendment. In construing the quoted provision of the Washington constitution the supreme court of that state held that the right of the city to exercise the police power over a particular subject-matter ceases when the state acts by establishing commission control. In that case there was an attempt by the city of Seattle to regulate the operation of the street railroads, which by the terms of the general law had been made common carriers, subject to commission control.
The case of State, ex rel. Webster, v. Superior Court for King Co., 67 Wash., 37, was peculiarly similar to the instant case. That, was a telephone company case. The procedure in that case covers this like a blanket. The telephone company was operating its telephone system in the city of Seattle. In June, 1910, complaint of a patron of the company was made to the public service commission of that state, and hearing was had, and an order was made directing the company to inaugurate a new schedule of rates higher than those fixed in the franchise theretofore granted by the city. As in this case, the city of Seattle attempted to enjoin the company from collecting the rates fixed by the commission. Thereupon the relator invoked the original jurisdiction of the supreme court of Washington in prohibition, asking that “a writ be made to run against the superior court, prohibiting it from further proceeding in defiance *214 of the order of the public service commission.” The court held that, under the provision of the Washington constitution quoted, there remained the reservation of general legislative power in the state, and that “a franchise granted by a city to a telephone company under authority of a special city charter is subject to such reservation, and may be controlled or modified by subsequent acts of the legislature,” and awarded a writ of prohibition against the superior court.
To the same effect is the decision of the supreme court of that state in State, ex rel. Great N. Ry. Co., v. Railroad Commission, 52 Wash., 33.
The provision of Section 16, Article IX of the Missouri Constitution, adopted in 1875, is as follows : “Any city * * * may form a charter for its own government, consistent with and subject to the Constitution and laws of this State,” etc.
In State, ex rel. Gardner, v. M. & K. Telephone Co., supra, the supreme court of Missouri held that' the police power of rate making was not a purely municipal power, and that under the provisions of the constitution a city “may form a charter for its own government;” but the power of price regulation for telephone service within the city was not conferred upon the city by that constitutional provision.
By the provisions of the constitution of Oregon the voters of a municipality are authorized to enact and amend their charters “subject to the Constitution and criminal laws of the State of Oregon.” That state had created a public board known as the public service commission of Oregon, with *215 power to make or substitute such rate or rates as should be just and reasonable. The supreme court of the state held that the constitutional grant did not empower the cities of Oregon “to provide for the fixing of rates of public utilities granted franchises within their limits, which cannot be changed by a commission created by general law.”
Cases construing the provisions of the California constitution would not be helpful in determining this case for the reason that the freeholders’ charters of that state granting police power emanate from the legislature. While Section 8, Article XI of the California Constitution, provides that any city “may frame a charter for its own government, consistent with and subject to the constitution,” the constitution expressly provides that such charter shall be submitted to the legislature, and if approved by a majority of each house, shall become the organic law of the city. They therefore obtain, in respect to matters pertaining to police regulation, their grant of power directly from the sovereign authority. This explains the language in Home Telephone & Telegraph Co. v. Los Angeles, 211 U. S., 265, where it is held: “Only the legislature of a State, or a municipality specifically authorized thereto by the legislature, can surrender by contract a governmental power such as fixing rates.”
The supreme court of Oregon in the case of Woodburn v. Public Service Commission, supra, held that enabling provisions of the Oregon constitution, empowering cities to enact charters “subject to the Constitution and criminal laws of the *216 State of Oregon,” did not empower municipalities with authority to fix the rates of public service utilities, granted franchises within their limits, which could not be changed by a commission created by a general law. On page 127 the court says: “The right of the state to regulate rates by compulsion is a police power, and must not be confused with the right of a city to exercise its contractual power to agree with a public service company upon the terms of a franchise. The exercise of a power to fix rates by agreement does not include or embrace any portion of the power to fix rates by compulsion;” that when a city entered into a contract it did so subject to the reserved right of the state to employ its police power to compel a change of rates; that when the state did speak “the municipal power gave way to the sovereign power of the state.” In that case the telephone company had applied to the public service commission for permission to increase telephone rates above that fixed in the franchise obtained from the city council.
In the instant case the city also contends that it has the right to enforce compulsory rate regulation under the provisions, of Section 4, Article XVIII of the Constitution, as amended in 1912. That section provides that “Any municipality * * * may contract with others” for the product or service of public utilities. It will be seen that this section does not apply merely to cities with home-rule charters, but to any municipality in the state. The grant of power therein conferred is substantially similar to those theretofore enjoyed *217 by cities and villages under legislative grants where they were authorized to contract with others for the products or services of utilities, such as lighting the streets or furnishing water to the municipality. (Section 3809, General Code.) The scope of the constitutional grant above referred to is no greater than that theretofore contained in the statute, and yet no one can contend that the latter conferred upon municipalities the right to enforce compulsory rates. A contract implies the assent of both the contractor and contractee, and this is all that the constitutional provision intended. The state neither i-n terms nor by intendment conferred upon the municipalities of the state the sovereign power of unilateral rate making for public utilities zvithout a contract assented to by both parties thereto. As stated in the Woodburn case, supra, the power to fix rates by agreement did not include the power to fix rates by compulsion. In the- latter case, the supreme court of Oregon, in support of the principle under discussion, cited the case of Benwood v. The Public Service Commission, 75 W. Va., 127, where it is held that the provision contained in a municipal charter “authorizing the municipal corporation to ‘contract and be contracted with’ did not delegate beyond the State’s control the power to fix public service rates.”