[No. 24327. *En Banc.* April 21, 1933.]

THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY, *Appellant,* v. THE CITY OF SEATTLE *et al., Respondents.*[1]

[1]Reported in 21 P. (2d) 721.

*McMicken, Ramsey, Rupp & Schweppe* and *Winlock W. Miller, Jr.,* for appellant.

*A. C. Van Soelen, Walter L. Baumgartner,* and *C. V. Hoard,* for respondents.

BLAKE, J.—The plaintiff brought this action to enjoin the defendant from collecting a license tax under ordinance No. 62,662, being entitled:

"An ordinance relating to, and providing for, a license or occupation tax upon certain businesses, occupations, pursuits and privileges; defining offenses and providing penalties."

A demurrer interposed to the amended complaint was sustained. The plaintiff, electing to stand on the

pleading, appeals from a judgment dismissing the action, and assigns error as follows:

"(1) The court erred in sustaining respondents' demurrer to appellant's amended complaint.

"(2) The court erred in dismissing appellant's cause of action.

"(3) The court erred in failing to hold that the enforcement of the ordinance as to appellant would contravene the fourteenth amendment to the constitution of the United States, and article I, § 3, and article VII, § 9, of the constitution of the state of Washington."

The pertinent provisions of the ordinance are:

"Section 1. Exercise of Revenue License Power: The provisions of this ordinance shall be deemed an exercise of the power of the City of Seattle to license for revenue.

"Section 2. . . . GROSS INCOME: The value proceeding or accruing from the sale of tangible property or service, and receipts (including all sums earned or charged, whether received or not) by reason of the investment of capital in the business engaged in, including rentals, royalties, fees or other emoluments, however designated (excluding receipts or proceeds from the use or sale of real property or any interest therein, and proceeds from the sale of notes, bonds, mortgages, or other evidences of indebtedness or stocks and the like) and without any deduction on account of the cost of the property sold, the cost of materials used, labor, costs, interest or discount paid, or any expense whatsoever, and without any deduction on account of losses."

"Section 5. Occupations Subject to Tax—Amount: There are hereby levied and shall be collected annual license fees or occupation taxes against the persons on account of the business activities, and in the amounts to be determined by the application of the rates against gross income as follows:

"(a) Upon every person engaged in or carrying on a telegraph and/or telephone business, a fee or tax equal to four per cent. (4%) of the total gross income from such business in the city during his fiscal year

next preceding the tax year for which the license is required; provided however, that the minimum fee or tax shall not be less than one Thousand ($1,000.00) Dollars per tax year.''

The appellant sets up some twenty-one separate grounds or reasons why the tax sought to be collected from it under the ordinance is invalid. For the purposes of this discussion, these may be classified into five groups: (1) That the city has no power to levy such a tax; (2) that the state has preempted this field of taxation; (3) that the definition of ''gross income'' is so indefinite and uncertain that neither the income subject to the tax nor the amount thereof can be ascertained; (4) that the tax is unreasonable, oppressive and confiscatory; and (5) that the tax is in contravention of appellant's rights under the act of Congress of July 24, 1866, known as the Post Roads act.

■ It is first contended that there is no grant of power from the state to the city to levy such a tax. The power under which the right to levy the tax is asserted is found in Rem. Rev. Stat., §§ 8966 and 8981.

Section 8966 relates to the powers of cities of the first class, and, among other things, provides:

''Any such city shall have power— . . . ''33. To grant licenses for any lawful purpose, and to fix by ordinance the amount to be paid therefor, and to provide for revoking the same: Provided, that no license shall be granted to continue for longer than one year from the date thereof; . . .''

Section 8981 provides:

''Any city adopting a charter under the provisions of this act shall have all the powers which are now or may hereafter be conferred upon incorporated towns and cities by the laws of this state, and all such powers as are usually exercised by municipal corporations of like character and degree, whether the same shall be specifically enumerated in this act or not.''

This court has held in numerous cases that cities and towns, under the powers granted, have the right to impose license taxes either for the purpose of regulation or revenue. *Fleetwood v. Read,* 21 Wash. 547, 58 Pac. 665, 47 L. R. A. 205; *Walla Walla v. Ferdon,* 21 Wash. 308, 57 Pac. 796; *Stull v. DeMattos,* 23 Wash. 71, 62 Pac. 451, 51 L. R. A. 892; *In re Garfinkle,* 37 Wash. 650, 80 Pac. 188; *Sumner v. Ward,* 126 Wash. 75, 217 Pac. 502; *Bucoda v. Swaney,* 163 Wash. 43, 299 Pac. 652.

Speaking of the grant of power contained in subdivision 33, § 8966, *supra,* in the *Fleetwood* case, Judge Dunbar said:

"This provision is in relation to cities of the first class. . . . The language is comprehensive. The authority is to grant licenses for any lawful purpose, and, in the absence of restriction, the purpose of raising revenue is as lawful as the purpose of exercising the police power. This interpretation is borne out, we think, by the authorization of the legislature to cities of other classes. . . . And so the power to license for purposes of revenue is especially granted to all the other classes of cities."

We think that, by virtue of § 8981, *supra,* the power to license for purposes of revenue is also "especially granted" to cities of the first class. In any event, subdivision 33 of § 8966 has been uniformly construed to confer such power. *Pacific Tel. & Tel. Co. v. Everett,* 97 Wash. 259, 166 Pac. 650.

■■ It is contended that, conceding the power, the city is precluded from exercising it, because the state has preempted this field of taxation. With respect to police powers, it is a rule of universal application that a municipality may not enact regulatory ordinances upon subjects covered by state legislation. *State ex rel. Webster v. Superior Court,* 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913D 78, L. R. A. 1915C 287; *Seattle*

*Electric Co. v. Seattle,* 78 Wash. 203, 138 Pac. 892. Whether this rule is applicable in cases involving the exercise of the taxing power, it is not necessary for us to determine, because the state had not entered this field of taxation at the time the ordinance in question was enacted.

It must be kept in mind that the power granted to the city to issue licenses is dual: (1) for regulation; (2) for revenue. The power here exercised is for revenue and not for regulation. Here the granting of the license is an incident to the power to raise revenues. The license is the means, not the end. It is the method provided for raising the revenues. The penalty provided is merely a mode of enforcing payment, and the license is only a receipt for the tax. *Home Insurance Co. v. City Council,* 93 U. S. 116. The tax is an excise. It is levied upon the right to do business, not upon the right to exist; nor upon the property. The cases relied upon by appellant on this point so characterize such a tax. *State ex rel. Zielonka v. Carrel,* 99 Ohio 220, 124 N. E. 134; *Cincinnati v. American Telephone & Telegraph Co.,* 112 Ohio 493, 147 N. E. 806; *Firestone v. Cambridge,* 113 Ohio 57, 148 N. E. 470.

In 1 Cooley on Taxation (4th ed.), § 26, it is said:

"One distinction between a tax upon a business . . . and a license is said to be 'that the former is exacted by reason of the fact that the business is carried on . . . within the jurisdiction of the taxing power, and the latter is required as a condition precedent to the right to carry on such business . . . within the jurisdiction.' So it has been said that a charge cannot be deemed a license rather than a tax unless the payment thereof confers some right or privilege upon the person charged which otherwise would not exist."

A license is granted under the police power; an excise is imposed under the taxing power. The former

is essentially not a tax at all. 1 Cooley, Taxation (4th ed.), § 26.

"The distinction between a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. The proceedings may be the same in the two cases, although the purpose is essentially different. The one is made for regulation and the other for revenue. If for regulation, it is an exercise of the police power while if for revenue it is an exercise of the taxing power." 1 Cooley, Taxation (4th ed.), § 27.

Bearing this distinction in mind, we shall examine briefly the statutes by virtue of which appellant contends that the state has preempted the field of taxation covered by the ordinance.

Laws of 1929, chapter 107, p. 209 (Rem. Rev. Stat., § 10417), requires public utility companies, subject to regulation as to rates and charges by the department of public works, to "pay to the department of public works a *fee* of 1/10 of one per cent of such gross operating revenue. . . ." This act is amendatory of chapter 107 of the Laws of 1923, p. 290, § 1, which in turn was amendatory of chapter 113 of the Laws of 1921, p. 354, §§ 1 and 3. The earlier laws fixed flat rates, determined by gross earnings, ranging from five dollars to $1,500.

Laws of 1921, chapter 113, p. 354, § 1, refers to persons and corporations required to file statements with the director of public works under chapter 117, Laws of 1911, p. 589, § 78, Rem. Rev. Stat., § 10416, and requires them to pay *"a fee"* in accordance with a fixed schedule. Section 2, chapter 113, Laws of 1921, p. 354, then provides:

"All sums collected by the director of public works under the provisions of this act shall within thirty days after their receipt be paid to the state treasurer, and by him deposited in a *fund to be known as the pub-*

*lic service revolving fund."* (Italics ours.) Rem. Rev. Stat., § 10418.

Chapter 117, Laws of 1911, p. 538, Rem. Rev. Stat., § 10339, is the public service commission law, and is purely a regulatory act. *State ex rel. Webster v. Superior Court,* 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913D 78; L. R. A. 1915C 287; *Seattle Electric Co. v. Seattle,* 78 Wash. 203, 138 Pac. 892. Obviously, chapter 107, Laws of 1929, p. 209, chapter 107, Laws of 1923, p. 290, and chapter 113, Laws of 1921, p. 354, are adjuncts to that act. It is equally obvious from the words which we have italicized in § 2 of the latter act, that the fund created was solely for the purpose of defraying the expense attendant to the administration of the public service commission law. We think it is clear, from the entire context of the act of 1921, that the purpose of it was regulatory. The raising of the rates in the act of 1923 and the changing of the method of computation of the *fee* to be paid in the act of 1929 have not changed its character.

It is further contended that by chapter 227, Laws of 1929, p. 631 [Rem. Rev. Stat., § 3836-1 *et seq.*], the state has preempted this field of taxation. That act is entitled, "An Act relating to fees of foreign and domestic corporations . . .;" and the tax exacted has been held to be a license fee to which corporations are subjected for the privilege of doing business in this state in a corporate capacity—as a corporate entity. In *Spokane International Ry. Co. v. State,* 162 Wash. 395, 299 Pac. 362, construing this act, it is said:

"The tax is upon the privilege the state grants to the corporation to engage in commerce with the advantages derived from a corporate organization, not upon the commerce itself."

That "gross income" is a proper basis for determining the amount of the tax to be paid, is well

established by the authorities. 1 Cooley, Taxation (4th ed), § 42; *State v. Minnesota & International R. Co.,* 106 Minn. 176, 118 N. W. 679; *State v. Central Trust Co.,* 106 Md. 268, 67 Atl. 267; *People ex rel. Westchester Lighting Co. v. Gaus,* 46 Ind. App. 695, 92 N. E. 230; *State v. United Electric Light & Water Co.,* 90 Conn. 452, 97 Atl. 857; *Nebraska Telephone Co. v. Lincoln,* 82 Neb. 59, 117 N. W. 284, 28 L. R. A. (N. S.) 221. The definition of ''gross income,'' contained in the ordinance, is substantially the same as that contained in the act of West Virginia, considered in the case of *Hope Natural Gas Co. v. Hall,* 274 U. S. 284. The tax challenged in that case was sustained.

It would be practically impossible to define ''gross income'' so that more or less pertinent objections could not be aimed at the definition. We are satisfied, however, that the objections raised by appellant are more fancied than real; and that, in practical application, under present day systems of accounting, appellant will have no serious difficulty in ascertaining the amount of tax it is required to pay. The task of segregating revenues derived without the city from those derived within, affords no legal objection to the tax. *Western Union Tel. Co. v. Fremont,* 39 Neb. 692, 58 N. W. 415, 26 L. R. A. 698; *Postal Telegraph Cable Co. v. Charleston,* 153 U. S. 692.

It is next contended that the tax is unreasonable, oppressive and confiscatory. ''The power to tax carries with it the power to destroy,'' has been so frequently stated that it has become axiomatic. Yet, practically, the power to tax is limited to what is reasonable. Oppressive or confiscatory taxes ordinarily will not be sustained. But whether a tax is reasonable is primarily a legislative problem, and the courts will not hold a tax invalid on the ground that it is oppressive or confiscatory, unless there is clear abuse of the

power conferred. It is said in 4 Cooley, Taxation (4th ed.), § 1714:

"Where an excise tax is imposed for revenue, as distinguished from a fee imposed merely for regulation, the extent of the tax, when not limited by the grant itself, must be understood to be left to the judgment and discretion of the municipal government, to be determined in the usual mode in which its legislative authority is exercised; but the grant of authority to impose fees for the purposes of revenue does not warrant their being made so heavy as to be prohibitory, thereby defeating the purpose, where the business or occupation is a useful and lawful one, although there is some authority apparently to the contrary which would preclude a court from considering the amount of the tax in any case. So far as the right to engage in a business of a harmless and useful character is concerned, 'the state may not impose an occupation tax which shall operate as a prohibition or as a burden of magnitude sufficient to render the right valueless.' But a tax for revenue possibly may be made so large as to be prohibitive, where the occupation may be prohibited, although in such a case the fee ordinarily is deemed an exercise of the police power rather than of the taxing power."

This rule has been stated by this court. *Stull v. De Mattos,* 23 Wash. 71, 62 Pac. 451, 51 L. R. A. 892; *In re Garfinkle,* 37 Wash. 650, 80 Pac. 188.

In *Nebraska Telephone Co. v. Lincoln,* 82 Neb. 59, 117 N. W. 284, 28 L. R. A. (N. S.) 221, a levy of two per cent of gross earnings was upheld. A tax of five per cent was sustained in *Lincoln Traction Co. v. Lincoln,* 84 Neb. 327, 121 N. W. 435. In *City of St. Louis v. United Rys. Co.,* 263 Mo. 387, 174 S. W. 78, a tax was levied, and upheld, on each car used for transporting passengers, at the rate of one mill for every passenger carried. A tax of two per cent on gross receipts was upheld in *Southwestern Oil Co. v. State of Texas,* 217

U. S. 114. In that case, quoting from *Delaware Railroad Tax Cases,* 18 Wall. 206, the court said:

"It is not for us to suggest in any case that a more equitable mode of assessment or rate of taxation might be adopted than the one prescribed by the legislature of the state; our only concern is with the validity of the tax; all else lies beyond the domain of our jurisdiction."

We do not think the rate fixed by the ordinance is unreasonable, oppressive or confiscatory.

Appellant next contends that, under the act of Congress of July 24, 1866 (U. S. C. A., Title 47, § 1), it has the right to occupy the streets without the city's consent. Conceding this right, it does not impair the city's power to levy taxes on the beneficiaries of the act. In *Williams v. Talladega,* 226 U. S. 404, it is said:

"These cases, taken together, establish the proposition that the privilege given under the terms of the act to use the military and post roads of the United States for the poles and wires of the company is to be regarded as permissive in character and not as creating corporate rights and privileges to carry on the business of telegraphy, which were derived from the laws of the state incorporating the company, and that this permissive grant did not prevent the state from taxing the real or personal property belonging to the company within its borders or from imposing a license tax upon the right to do a local business within the state."

The demurrer to the amended complaint was properly sustained, and the judgment is affirmed.

BEALS, C. J., HOLCOMB, MILLARD, MITCHELL, and MAIN, JJ., concur.

TOLMAN, J., took no part.

STEINERT, J. (dissenting)—I can not agree with either the reasoning or the result of the majority opinion. It is to be borne in mind that the case is before us on the amended complaint, a demurrer thereto

which was sustained, and a judgment dismissing the action.

The amended complaint is too long to be set forth in its entirety; a brief summary of it must suffice. Its allegations may be reduced to the following statement: Appellant is a California corporation, and as such has complied with the laws of this state relating to foreign corporations. It owns and operates a telephone and telegraph system, and does both an intrastate and interstate business.

For the sake of convenience and adequate service to its patrons, it has divided the state of Washington into a number of exchange areas. The "Seattle exchange area" includes several thousand telephones outside the limits of the city of Seattle. Service between telephones within the same exchange area is designated "telephone exchange service"; the service between telephones located in different exchange areas is designated "telephone toll service." The company's accounts are kept in accordance with forms prescribed by the Interstate Commerce Commission and the department of public works of Washington. The company has a central office equipment in Seattle having a value in excess of ten million dollars. Through its central office is rendered not only exchange service within the Seattle exchange, but also toll service, both intrastate and interstate. The company also has central office equipments in the other exchange areas throughout the state, aggregating in value about twenty million dollars.

The company's business in the city of Seattle, according to the amended complaint, has at all times been conducted in an efficient and economical manner. Its net earnings derived from its business in the Seattle exchange during the first three months of 1932, stated in rate per cent annual return upon the cost of its prop-

erty used and useful in furnishing service within the exchange, were not in excess of 3.25%; its net earnings from business wholly within the city's limits were somewhat less. Subsequent to the first three months of 1932, the net earnings declined, and conditions existing at the time that the action was commenced indicate a probable further decline.

The company has paid all its taxes for the years prior to 1931. In 1932 it paid taxes for 1931 on its real estate inside the city, in the sum of $96,908.41, of which the city received $44,164.01 as its proportion. The company also paid $302,590.97 as the first half of 1931 personal property taxes, of which the city received $126,-664.52. The remaining half became payable after this action had been commenced.

It is alleged in the amended complaint that the company was licensed by the state of Washington to engage in the telephone and telegraph business in and throughout the state, including the city of Seattle, for which license it paid the state, in 1932, a fee of $12,-777.11; that the duty to give telephone service in Seattle and elsewhere in the state is a continuous one, and can not be terminated except with the consent of the state; and that, for more than twenty-one months last past, the company has not earned a fair return upon its property, and that the tax is arbitrary, unreasonable and confiscatory. The demurrer, of course, admits these allegations.

My first reason for dissent is that, under the allegations of the amended complaint, a *prima facie* case is stated. Not only is it directly alleged that the license fee is arbitrary, unreasonable and confiscatory, but sufficient facts to support the allegation, if it be considered as a mere conclusion, are also stated. We can not disregard those facts or the issue tendered thereby. If the city can fix the rate at four per cent, it can also fix

it at ten. It is as easy to specify the one as it is the other. There is no innate virtue in the figure four, nor any inherent vice in the figure ten. We can not say, nor are we privileged to say, dogmatically, that a fee of four per cent, as prescribed by the ordinance, is not unreasonable or confiscatory, or that a fee of ten per cent would be. It will require evidence, probably of an expert nature, to show what the actual situation is, and, until that evidence is produced, we can not prejudge it. The demurrer should have been overruled for this reason alone, if for no other.

But I go further. The ordinance is not regulatory, but simply one for revenue. Not only does the ordinance declare it to be a revenue measure, but its very terms make no provision for regulation. This much is conceded in the majority opinion. The question then presents itself: Has the city the right to compel the company to obtain a license from it and to pay a tax or fee therefor, before it can *continue* to carry on its business within the city?

Section 3 of the ordinance provides that, after July 1, 1932, no person *may engage* in any business, occupation, pursuit or privilege for which a license fee or tax is imposed, *without a license;* that any taxpayer who carries on his business without such license shall be guilty of a violation of the ordinance for each day that the business is carried on or conducted. Section 24 provides that any person failing to comply with any of the provisions of the ordinance shall be guilty of a misdemeanor, punishable by a fine in any sum not to exceed three hundred dollars, or by imprisonment in the city jail for a term not exceeding ninety days, or by both such fine and imprisonment.

If the city can not compel the taking out of a license, then it can not impose the tax. In the case before us, the company had, under chapter 227, Laws of 1929, p.

634, § 5, Rem. Rev. Stat., § 3836-5, paid the state the sum of over twelve thousand dollars for the privilege of doing business in the state of Washington, for the year 1932. The privilege so obtained was comprehensive and subject to no limitations. The city could not give the company something that it already had; nor, conversely, could it take away or withhold a right that the company then possessed. The sovereign having granted the right, the city could not withdraw it. Since it could not take it away, it can not hamper its exercise in the manner attempted. *Mayor and Aldermen of Savannah v. Georgia*, 36 Ga. 460; *Reser v. Umatilla County*, 48 Ore. 326, 86 Pac. 595, 120 Am. St. 815; Cooley on Taxation, 4th Ed., § 1691. A license is simply the authority to conduct a business or pursue a calling, or the right conferred by the municipality which makes the pursuit lawful and without which it would be unlawful. The appellant having been authorized by the state to conduct its business within the state, the city can not make that pursuit unlawful.

The majority opinion cites the following cases in support of the rule that cities and towns may impose taxes either for revenue or regulation: *Fleetwood v. Read*, 21 Wash. 547, 58 Pac. 665, 47 L. R. A. 205; *Walla Walla v. Ferdon,* 21 Wash. 308, 57 Pac. 796; *Stull v. DeMattos,* 23 Wash. 71, 62 Pac. 451, 51 L. R. A. 892; *In re Garfinkle,* 37 Wash. 650, 80 Pac. 188; *Sumner v. Ward,* 126 Wash. 75, 217 Pac. 502; *Bucoda v. Swaney,* 163 Wash. 43, 299 Pac. 652. Those cases do announce that rule, it is true, but neither they nor the rule therein announced are applicable here, for the reason that in none of those instances had the state previously granted the privilege. Consequently, the municipality there had the right to exact a license for the conduct of the business, and the payment of a tax therefor. If the parties did not care to engage in business on the

terms exacted, they could either have refrained from entering upon it or else withdrawn if they had already begun. The situation here is not at all comparable. The company can not withdraw from the field, but must continue to function; that was one of the considerations for which it was permitted to enter the state.

Approaching the matter from a somewhat different angle, I am of the view that the particular field of taxation had already been preempted by the state under chapter 113, Laws of 1921, p. 354, Rem. Comp. Stat., § 10417, chapter 107, Laws of 1923, p. 290, Rem. 1927 Supp., § 10417, both amended by chapter 107, Laws of 1929, p. 209, Rem. Rev. Stat., §§ 10417-10419; and chapter 227, Laws of 1929, p. 634, § 5, Rem. Rev. Stat., § 3836-5. The amending act of 1929 requires every public utility to file with the department of public works an annual statement showing its gross operating revenues for the preceding year, and to pay a fee of one-tenth of one per cent thereon. All such fees are required to be deposited in the public service revolving fund. The act makes the failure to pay such fees a misdemeanor punishable by a fine for each day's failure to pay. The last act requires all foreign corporations doing intrastate business in this state to pay certain fees for the privilege of doing such business.

Those acts are, in my opinion, purely license acts, and not regulatory. The funds derived therefrom are not devoted to the purpose of regulation, but, with the exception of the annual fees paid to the secretary of state, are required to be paid into the public service revolving fund, which is a general fund of the state subject to reappropriation by the legislature. The right to appropriate funds, under Art. VIII, § 4, of the state constitution, is recognized in *State ex rel. Bloedel-Donovan Lumber Mills v. Clausen*, 122 Wash. 531, 211

Pac. 281, and *State ex rel. Shuff v. Clausen,* 131 Wash. 119, 229 Pac. 5.

The state having occupied the field of excise taxation, the city may not encroach upon it. We have here the same situation, in principle, as was presented in *State ex rel. Webster v. Superior Court,* 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913D 78, L. R. A. 1915C 287, where the right of the state was declared supreme and exclusive. The state having granted the privilege and having taxed it, the city could not thereafter exact an additional sum for the same privilege or right; otherwise, the municipality, by added exactions, could thwart the whole purpose of the state in admitting corporations to do a specific business therein on such terms as it saw fit to fix. The sovereign would be subsidiary to its various subdivisions. *Cincinnati v. American Telephone & Telegraph Co.,* 112 Ohio 493, 147 N. E. 806; *Firestone v. City of Cambridge,* 113 Ohio 57, 148 N. E. 470; *Cincinnati Oil Works v. City of Cincinnati,* 177 N. E. (Ohio App.) 768.

Further, I think that the definition of "gross income" in the ordinance is so vague and uncertain as to render the ordinance inoperative and void. By its provisions, the ordinance is penal. Fine and imprisonment are the penalties for non-compliance. The taxpayer is entitled to know definitely and certainly the amount of tax which he is required to pay and the method of its ascertainment, without the expense of litigation necessary to determine either. *Western Union Telegraph Co. v. Texas,* 62 Tex. 630; *State ex rel. Crow v. West Side Street Ry. Co.,* 146 Mo. 155, 47 S. W. 959; *Standard Oil Co. v. State,* 178 Ala. 400, 59 So. 667; *Winslett v. Case-Fowler Lumber Co.,* 173 Ga. 539, 160 S. E. 384.

Looking at the terms of the ordinance, I do not see how the taxpayer could possibly determine the amount

of tax to be paid by it, or the method of its ascertainment, without resort to litigation. Different and vitally conflicting views will arise out of the interpretation of its language. Section 2 of the ordinance reads as follows, with reference to the definition of income:

"GROSS INCOME: The value proceeding or accruing from the sale of tangible property or service, and receipts (including all sums earned or charged, whether received or not) by reason of the investment of capital in the business engaged in, including rentals, royalties, fees or other emoluments, however designated (excluding receipts or proceeds from the use or sale of real property or any interest therein, and proceeds from the sale of notes, bonds, mortgages or other evidences of indebtedness or stocks and the like) and without any deduction on account of the cost of the property sold, the cost of materials used, labor, costs, interest or discount paid, or any expense whatsoever, and without any deduction on account of losses."

Does the word "value" as there used import "cost price," "sale price," or "net profit" on the sale of tangible property or service? If any one of these was intended, it could easily have been expressed. Again, the word "receipts" expressly excludes receipts or proceeds from the use or sale of real property. Appellant's equipment to the extent of millions of dollars is housed in, and in large part is permanently affixed to, buildings which are a part of the realty. Are the receipts from that source, *pro tanto,* to be deducted? Who shall say? How is anyone to know? It may confidently be assumed that the city will insist that no deductions are to be made in that respect. As confidently may it be assumed that the appellant will insist to the contrary.

Many other questions are raised by the wording of this section, all of which lead to confusion in the attempt to interpret them. The majority opinion says

that the definition of "gross income" in the present ordinance is substantially the same as that contained in the act of West Virginia, considered and sustained in the case of *Hope Natural Gas Co. v. Hall*, 274 U. S. 284. I do not so read it. That act provided that persons engaging in certain businesses should pay a tax

". . . equal to the value of the articles produced as shown by the gross proceeds derived from the sale thereof by the producer (except as hereinafter provided) multiplied by the respective rates."

The language is not only entirely different, but upon its very face it shows that the tax is to be computed on the gross sales of the products. No such certainty or definiteness appears here. The rule by which the tax is to be measured should be definite and certain, and its definiteness and certainty should appear from its provisions, and not be the product of either litigation or compromise.

For the reasons suggested, and rather briefly stated in the light of the extended discussion in the briefs, I dissent.