CITY OF RICHMOND HEIGHTS, APPELLEE, *v.* LOCONTI, APPELLANT.

(No. 29148—Decided August 7, 1969.)

*Mr. Charles E. Merchant*, prosecutor, city of Richmond Heights, for appellee.
*Mr. George P. Allen*, for appellant.

SILBERT, C. J. This is an appeal on questions of law from a judgment against defendant in the Lyndhurst Municipal Court which has jurisdiction over the city of Richmond Heights.

Defendant was convicted of violating Section 705.05 of the Codified Ordinances of the City of Richmond Heights. That section reads as follows:

"705.05 DISTRIBUTOR'S LICENSE.

"No person shall distribute mechanical amusement devices or juke boxes within the corporate limits by lease, conditional sale or any financial conditional method without a distributor's license.

"A distributor, also being known as an operator, shall first obtain a distributor's license *from the Mayor* upon the payment of the annual license fee of one hundred dollars ($100.00). This license fee shall be for the fiscal year beginning January 1 of the calendar year *or for any unexpired portion of the fiscal year*.

"Nothing in this section shall be intended to prohibit

any person or the owner of a place of business to purchase the mechanical amusement device outright from any source, provided compliance is made for the annual license as hereinbefore set forth and upon presentation of a bill of sale therefor.'' (Emphasis added.)

One who so distributes any of the designated devices without first obtaining such a license is to be fined not more than $500. (Section 705.09)

Defendant was arrested, tried and convicted of violation of the ordinance, and was assessed a fine. Defendant brings this appeal.

Several pertinent facts relevant to this case have been set forth in stipulations by the parties, as follows:

''6. Henry LoConti has only one (1) place of business in the city of Richmond Heights in which he installed a juke box. The place of operation is a small pizza shop called DeMarco's.

''7. Henry LoConti did not purchase the One Hundred Dollar ($100.00) license. Henry LoConti had knowledge of the One Hundred Dollar ($100.00) license, but felt the amount of the license was unjust and confiscatory.
''* * *

''9. The cities of South Euclid and Richmond Heights have the same type of distributor's license. However, *Cleveland, Parma and Lakewood do not have a distributor's license, but do require a location license.*

''10. In Richmond Heights, each distributor must purchase an annual license for One Hundred Dollars ($100.00) if he has only one place of business or if he has many. However, within the entire City of Richmond Heights, there are only eight (8) to fifteen (15) possible locations.

''11. *The City of Richmond Heights does not charge a license fee for distributors of towel service, food or beverage distributors, or other distributors operating within the City of Richmond Heights, Ohio.*

''12. From January 7, 1965, to December 27, 1965, the gross income derived from one juke box amounted to Five Hundred Fifty Dollars and Sixty Cents ($550.60). This juke box was located at DeMarco's in Richmond Heights,

Ohio. Of this gross income, the location owner received Two Hundred Forty-two Dollars and Eighty-five Cents ($242.85) and the distributor or operator received Three Hundred Seven Dollars and Seventy-five Cents ($307.75). From the latter sum, the distributor or operator paid for his cost of service, repairs, tax, records, other supplies and depreciation." (All emphasis added.)

In the general index to the Codified Ordinances of the City of Richmond Heights, there are certain items of relevance herein. Under the heading of "Pinball," there is the notation "(see MECHANICAL AMUSEMENT DEVICES)." Neither in the index, under the heading, "Mechanical amusement devices," nor in the text of the ordinances falling within that subject, is there any reference by name to "pinball" or "pinball machine." Under the index heading, "Gambling," there is a subheading, "mechanical amusement devices," with a reference to Section 705.08. That ordinance provides that no person shall give any prize, etc., to a player or operator of any mechanical amusement device or to a contestant "for a high score on the device." The same ordinance is referred to under two subheadings within the index heading of "Mechanical amusement devices": "gambling," and "prizes or awards."

Section 705.01 of the city ordinances reads, in its entirety, as follows:

"705.01 DEFINITIONS.

"For the purpose of this chapter:

"(a) 'Mechanical amusement device' shall mean a machine which, upon the insertion of a coin or slug, operates or may be operated for use as a game, contest or amusement of any description, or which may be used for any game, contest or amusement and, which contains no automatic pay-off device for the return of money, coins, merchandise or tokens or checks redeemable in money or anything of value.

"(b) 'Juke box' shall mean any music vending machine, contrivance or device which, upon the insertion of a coin, slug, token, plate, disc, or key into any slot, crevice,

or other opening, or by the payment of any price, operates or may be operated, for the emission of songs, music or similar amusement.''

We interpret all of the above to indicate beyond any doubt that:

(1) For certain purposes, especially distribution, the City Council of Richmond Heights has seen fit to consider juke boxes and other mechanical amusement devices as *ejusdem generis*;

(2) In another connection (prohibition of gambling), the council has chosen to deal only with ''mechanical amusement devices,'' without mentioning juke boxes. Thus, under the doctrine, *inclusio unius est exclusio alterius*, it would have to be said that the Council of Richmond Heights does not regard ''juke boxes'' as being devices intended for, or capable of use in, gambling.

It is widely held that a license fee is not one for the raising of revenue, but is for regulatory purposes only. See, *e. g., Pacific Tel. & Tel. Co.* v. *City of Seattle* (1933), 172 Wash. 649, 654, 21 P. 2d 721, 723, affirmed, 291 U. S. 300, 78 L. Ed. 810, 54 S. Ct. 383; *Pennsylvania Liquor Control Bd.* v. *Publicker Commercial Alcohol Co.* (1943), 347 Pa. 555, 559-560, 32 A. 2d 914, 917; *Matheny* v. *City of Hutchinson* (1942), 154 Kan. 682, 686, 121 P. 2d 227, 230-231, 151 A. L. R. 1187, 1191-1192.

The courts of Ohio concur in this view, and make it clear that the power of a municipality to regulate through the means of a license is a police power under Section 3 of Article XVIII of the Ohio Constitution. *Auxter* v. *City of Toledo* (1962), 173 Ohio St. 444, 446; paragraph 1 of the syllabus in *Village of West Jefferson* v. *Robinson* (1965), 1 Ohio St. 2d 113.

There can be no doubt that the ordinance involved herein is intended to be strictly a license. Indeed, this is freely admitted by the city in its brief, wherein it contends, ''* * * [I]t is certainly far beyond the realm of reason to hold that the license fee is unreasonable and a source of revenue raising by the city of Richmond Heights.''

We note that the city ordinances impose additional

license fees on those who "*display or exihibit* a mechanical amusement device or juke box." There is an annual fee of $25 *per machine* on each "mechanical amusement device" and an annual fee of $10 *per machine* on each "juke box." Thus, although the license fees for *distribution* of both types of devices are the same, the fees for *display* of these two types are significantly different. It is obvious that the municipality feels that the regulation at the location site of the operation of "mechanical amusement devices" justifies a higher license fee than does such regulation of the operation of juke boxes. The classification of juke boxes, under Section 705.01, as being separate and distinct from other "mechanical amusement devices" is in accord with the difference in the respective license fees for display of the machines. Moreover, the fact that the amount of the license fee paid by those who display both types of machines is determined by the *number* of machines, is indicative of the fact that the license fee is connected to expenses of municipal regulation. We cannot ignore that there is no such logical connection regarding the license fee for *distributors*.

The courts of Ohio have upheld ordinances regulating and even *prohibiting* "pinball" machines. Although the ordinary operation of such machines themselves is not inherently unlawful, the determination of a city council that such machines *may* readily be used for gambling is part of a municipality's discretion under the police power granted by Section 3, Article XVIII of the Ohio Constitution. *Benjamin* v. *City of Columbus* (1957), 104 Ohio App. 293, affirmed, 167 Ohio St. 103, certiorari denied (1958), 357 U. S. 904, 2 L. Ed. 2d 1155, 78 S. Ct. 1147.

This reasoning was extended beyond those coin-operated devices which might be used for gambling, to uphold an ordinance regulating, by license, the operation of "mechanical amusement devices." *Columbus Legal Amusement Assn.* v. *City of Columbus* (Court of Appeals for Franklin County, 1947), 50 Ohio Law Abs. 353. The same case held even that coin-operated *vending* machines, which dispense merchandise, "are the proper subject of regula-

tion by license" under the police power. The court said, at page 360: "These machines, vending merchandise, would, basically, be less harmful than, but bear such relation to, automatic amusement devices, as defined in the ordinance, as to come in the same general category."

There is no logical distinction, at least insofar as the issues now before us are concerned, between a coin-operated machine which sells tangible merchandise, and a coin-operated juke box machine which "sells" music. "Amusement is a thing of value. Were it not so, it would not be commercialized." *Kraus* v. *City of Cleveland* (1939), 135 Ohio St. 43, 46.

It is apparent that the regulation of mechanical devices not capable of use in gambling may be a proper exercise of the police power. Therefore, the only question actually before us is whether the particular ordinance in question is such a proper exercise thereof.

The record discloses much that is revealing regarding the circumstances surrounding the purpose of the ordinance and the relation it has to the need for licensing of distributors such as appellant. Rather than quoting extensively from the bill of exceptions, we summarize in narrative form some illuminating testimony.

Robert Smoltz, Chief of Police of Richmond Heights, testified that, although applicants for licenses under this ordinance submit their applications to the Mayor, as required by ordinance, the Mayor's office then refers each application to the Chief of Police, who then processes the application and issues the license.

When asked the reason for regulation of juke boxes, the chief replied that instances of rowdyism occur at such locations, *but admitted that this rowdyism is not related to the existence or operation of the juke box machine.* The chief admitted that juke boxes are not placed for the purpose of drawing crowds, but rather are placed where crowds are likely to be anyway. He cited restaurants and taverns as typical location cites, contrasting them with gas stations and hardware stores.

When defense counsel concentrated the questioning on

whether rowdyism could arise "out of a multitude of reasons rather than amusement devices," the chief admitted this to be so, and admitted further that in many instances rowdyism was due to drunkenness. On redirect examination by the Law Director, the witness stated that the juke box location giving police their "main trouble" is a "drive-in" restaurant which serves no liquor. This fact, however, hardly serves to fasten the blame for rowdyism or other disorders onto a juke box. It is a matter of common knowledge that such restaurants are heavily frequented by teenagers and are furthermore often the site of rowdy and disorderly behavior. Moreover, a large portion of the business of such an enterprise is conducted in the parking area, with the patrons driving their cars into "stalls," placing their food orders through electronic "intercom" phones, and partaking of their meals in their automobiles, without ever entering the building where other patrons dine at tables as in the ordinary restaurant, and where a juke box might be located. It would be as illogical to blame the juke box for rowdyism at such a location as it would be to blame the cigarette machine or the coat rack. The chief stated, on direct examination, that the need for police supervision due to rowdyism applies also to location sites of pool tables, pinball machines and bowling machines. It is extremely noteworthy that, as indicated by stipulation No. 11, there is no license requirement as to the distributors of food and beverages, which bear as direct a relation to the sites of rowdyism as do juke boxes and mechanical amusement devices.

Indeed, the chief admitted that the police department has received no complaints regarding juke boxes. However, there had been complaints regarding pinball machines, and "some rumors that they are paying off," and there is private gambling going on in connection with their usage, although "We have never been able to prove nothing [*sic*]." Further, there were some complaints regarding coin-operated bowling machines.

Another factor cited by the chief for requiring police supervision of places where mechanical amusement devices

and juke boxes are located is the fact that burglars are attracted to such locations by the devices, which are capable of being broken open. In the course of one given year (1965) there were "about half a dozen cases," involving *all* types of machines.

In all of his testimony, the Chief of Police cited nothing indicating the slightest need for the *distributors* of mechanical amusement devices and juke boxes to be in any way involved with the regulation by the police of the places where such devices were located. Particularly revealing was the following colloquy during cross-examination:

"Q. And now after the license was issued by your department to each of these respective distributor operators, did you have occasion to contact any of these distributor operators for any reason whatsoever—any members of your department or you? A. Not unless—no, sir.

"The Court: After they were issued?

"By Mr. Allen:

"Q. *Once the licenses were issued you had no contact with them at all?* A. *No.*

"Q. Either by way of sending an officer to the business location of either of these distributor operators, or by sending them or issuing them citations, or by sending a letter you had no such contact with them once you issued the license? A. After we issued the license we had a few broken into.

"" * * *

"Q. But this had nothing to do actually, chief, with the distributor operator? You never contacted him about these things, did you? A. Yes, sir. We contacted him through the owner of the location. The owner of the location would contact him.

"Q. Your department didn't do that? A. No, sir.

"Q. *Your only contact was with the location owner?* A. *That is correct.*" (All emphasis added.)

The foregoing testimony clearly establishes two basic points: First, the only two factors involving juke boxes which require any police supervision are rowdyism at some

location sites, and the occasional theft of coins from juke boxes by burglars at location sites. Second, in neither event does the Police Department of the city of Richmond Heights make any contact with the distributors of the machines. All contact made by the police is with the location owner.

It is noteworthy that the location owner with one juke box in his premises pays an annual license fee of $10, while the man who supplied the machine to him is charged $100. The former is directly involved in both of the instances cited as requiring police supervision, and the latter is *never* involved. There is not the slightest connection between the $100 fee paid by a distributor of juke boxes and the police regulation supposedly necessitated by the existence of such a device. No mention is made of a need to investigate the background of the distributor, or to examine the devices in order to prevent fraudulent "rigging," nor is there any indication of the slightest need for any other regulation or supervision concerning either the activity of distributing such devices or the individuals who do so.

It is impossible to escape the conclusion that there is nothing inherent in the activity of *distributing* juke boxes or other mechanical amusement devices within the city of Richmond Heights which is the subject of any police supervision. Nor is there anything inherent in such activity which is shown to be inimical to the public health, safety, welfare or morals. Under such facts as these, the police power will not justify such an ordinance.

"Laws or ordinances passed by virtue of the police power which limit or abrogate constitutionally guaranteed rights must not be arbitrary, discriminatory, capricious or unreasonable and must bear a real and substantial relation to the object sought to be obtained, namely, the health, safety, morals or general welfare of the public.

"The courts of this country have been extremely zealous in preventing the constitutional rights of citizens being frittered away by regulations passed by virtue of the police power.

**110**

"If an enactment is referable to the police power, to be valid, the court must be able to say that it tends in some substantial degree to the prevention of offenses, or the preservation of health, morals, safety or general welfare of the public. Therefore, *if it is apparent that there is no plausible, reasonable and substantial connection between the provisions of the act and the supposed evils to be suppressed, there exists no authority for its enactment. Legislative bodies may not, under the guise of protecting the public interest, interfere with private business by imposing arbitrary, discriminatory, capricious or unreasonable restrictions upon lawful business.*" (Emphasis added.) *City of Cincinnati* v. *Correll* (1943), 141 Ohio St. 535, 539.

See, also, *City of Cleveland* v. *Raffa* (1968), 13 Ohio St. 2d 112, 116, certiorari denied, 393 U. S. 927.

It has long been the law in this state that the right to license is automatically accompanied by the right to levy an excise, in a reasonable sum, which sum *must* be related to the expenses which are caused to the community by the licensed occupation(s). *City of Cincinnati* v. *Bryson* (1846), 15 Ohio 625, 644-645. Where a license fee is imposed under the police power, for defraying the costs of inspection or other regulatory measures incident to the police power, the law's constitutionality "may be determined by its operative effect, though on its face it may be apparently valid." Paragraph one of the syllabus in *Castle* v. *Mason* (1915), 91 Ohio St. 296.

The disparity between the license fees for those who display "mechanical amusement devices" and those who display "juke boxes" ($25 vs. $10 annually, per machine) makes it manifest that the city regards cost of enforcement of operation of the former class of machines as higher than the cost of enforcement of the operation of the latter. We must then inquire as to:

(1) Whether it is then logical for the city to require an identical licensing fee for the distribution of both types of devices, and

(2) Whether the $100 annual distributor's license fee is justified by the expense which the activity of distribution causes to the community.

Unless both questions can be affirmatively answered, the distributor's license cannot be considered constitutionally valid, in view of the restricted reasons for which a license fee may be imposed.

According to the testimony of Chief Smoltz, there are indeed many similarities in the circumstances surrounding the operation both of mechanical amusement devices and of juke boxes. Thus, the first of the two above questions might well be answered in the affirmative. *Columbus Legal Amusement Assn.* v. *City of Columbus, supra* (50 Ohio Law Abs. 353). However, it is manifest that only a negative reply can be made to the second question. In view of the long-established law of the *Bryson* and *Castle cases, supra,* the failure of the fee herein involved to meet the requirement of a reasonable relation to the burden on the community is fatal to the ordinance. The single activity of distribution of the devices obviously imposes no burden on the municipality other than the actual processing of the license application and the issuance of the license. The ordinance is arbitrary and discriminatory and therefore not a proper exercise of the municipality's police power.

It is possible for an ordinance, which purports to impose a license fee, to impose, in reality, an excise tax on an occupation, privilege or franchise. Thus, in *Firestone* v. *City of Cambridge* (1925), 113 Ohio St. 57, the Supreme Court dealt with an ordinance "purporting to * * * regulate the use of the streets and avenues of the city * * *." It prohibited the use of vehicles on the city streets unless a license fee was first paid. The ordinance provided that money collected as such fees should be applied by the city, first, to costs of issuing licenses, then to costs of cleaning, maintenance and repair of the city streets. The ordinance recited further the need for increased numbers of policemen, increased expenditures for cleaning, maintenance and repair of the streets, all due to the increased traffic on the streets.

The court held that the ordinance, notwithstanding its language, "is not, nor was it intended to be, a regulatory measure, but that, by whatever name it may be called, it is in fact an excise tax imposed for the purpose of raising

revenue.'' The court stated that, even though an ordinance regulation purporting to be a license is in fact an excise, it may nonetheless be a proper means of exercising the municipality's taxing power, citing *State, ex rel. Zielonka*, v. *Carrel* (1919), 99 Ohio St. 220. (The court then held the tax ordinance invalid, since the General Assembly had already enacted an excise on motor vehicle operation, and the ordinance was thus considered ''in conflict with general laws.'')

The *Firestone case* appears to be unique in this state. In Ohio, the power to tax and the power to regulate through license are rarely thought of as interchangeable, though they are compatible and are not at all mutually exclusive.

However, even if *Firestone* were not unique in its interpretation of an obvious licensing ordinance as being in reality a taxing measure for general revenue purposes, it is readily distinguishable from the case now before us. The court in *Firestone* found that the lengthy recitation of the need for increased income, and the delineation of the applications to be made of the funds collected through the ''license'' fee, both of which were included in the ordinance itself, manifested the municipality's intention that the ordinance be a revenue tax, notwithstanding its conformity to the technical requirement of a license (*i. e.,* that the payment of the license fee be a prerequisite to the activity in question). By contrast, the plaintiff City of Richmond Heights, in the instant case, steadfastly maintains that it. is ''beyond the realm of reason'' to hold the ordinance involved herein to be a source of revenue raising. Not only do we here consider an ordinance devoid of any language suggesting that its purpose is as a general or excise tax, but we also are given the benefit of an explicit statement by the municipality as to the purpose of the ordinance. Thus, there is no room here for us to interpret the municipality's intention to be other than to levy a license fee. However, even if we were to interpret the ordinance in question here as being an excise tax on the occupation of ''distributing'' juke boxes, the ordinance would be constitutionally invalid as arbitrary and discriminatory.

In interpreting an Ohio tax, the Supreme Court of the United States stated:

"The state may impose different specific taxes upon different trades and professions * * *. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to * * * use or value. * * *.

"But there is a point beyond which the state cannot go without violating the equal protection clause [of the 14th Amendment of the United States Constitution]. *The state must proceed upon a rational basis and may not resort to a classification that is palpably arbitrary.* The rule often has been stated to be that the classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation.' * * * 'If the selection or classification is neither capricious nor arbitrary, *and rests upon some reasonable consideration of difference or policy,* there is no denial of the equal protection of the law.' * * * That a statute may discriminate in favor of a certain class does not render it arbitrary if the discrimination is founded upon a reasonable distinction, or difference in state policy. * * *." (Emphasis added; citations omitted.) *Allied Stores of Ohio, Inc.,* v. *Bowers* (1959), 358 U. S. 522, 527-528, 3 L. Ed. 2d 480, 484-485, 79 S. Ct. 437, 440-441, 9 Ohio Opinions 2d 321, 324-325, 82 Ohio Law Abs. 312, 316-317.

We acknowledge the settled principles that a legislative authority has a wide discretion regarding taxation, especially excise taxes, and that every reasonable presumption must be indulged in favor of the constitutionality of a statute. *State, ex rel. Prospect Hospital, Inc.,* v. *Ferguson* (1938), 133 Ohio St. 325, 329-330. We also acknowledge, however, that wide discretion is not unlimited discretion, and that reasonable presumptions require reasonable interpretation.

It is "settled law" in Ohio "that a municipality may levy and collect an excise tax for local purposes so long as it is not precluded by state legislation." *Haefner* v. *City of Youngstown* (1946), 147 Ohio St. 58, 61.

**114**

As the state government may levy excise taxes in the form of occupational taxes, a municipal government, under authority of Section 3, Article XVIII of the Ohio Constitution, may do likewise. Paragraphs 1 and 2 of the syllabus in *State, ex rel. Zielonka,* v. *Carrel* (1919), 99 Ohio St. 220.

The exercise of such power is constitutional unless the state's superior sovereignty supersedes the municipal power by enacting a state tax on the occupation in question. Paragraph 2 of the syllabus in *State, ex rel. Zielonka,* v. *Carrel, supra; Marion Foundry Co.* v. *Landes* (1925), 112 Ohio St. 166; paragraph 2 of the syllabus in *City of Cincinnati* v. *American Tel. & Tel. Co.* (1925), 112 Ohio St. 493.

Just as an excise tax on property must be based upon the "true value in money" of such property, an excise tax on a *privilege* must be based upon the "reasonable value" of the privilege. *Saviers* v. *Smith* (1920), 101 Ohio St. 132, 137. See, also, paragraph 3 of the syllabus in *Southern Gum Co.* v. *Laylin* (1902), 66 Ohio St. 578; paragraph 1 of the syllabus in *Calerdine* v. *Freiberg* (1935), 129 Ohio St. 453.

Nonetheless, it is not necessary that funds collected through an excise tax be used solely for the benefit of those who pay it. Paragraph 2 of the syllabus in *Calerdine* v. *Freiberg, supra.* Thus, the mere fact, that such funds go into the general fund of the governmental entity imposing the excise, does not invalidate the tax. Paragraph 1 of the syllabus in *State, ex rel. Schwartz,* v. *Ferris* (1895), 53 Ohio St. 314. The determination of the reasonable value of a privilege on which there is an excise rests "finally in the courts." Paragraph 3 of the syllabus of *Southern Gum Co.* v. *Laylin, supra.*

Even where the state has pre-empted the right to *license* a given occupation, a municipality may nonetheless enact and enforce an *excise tax* on such occupation. *However, such a tax must be clearly intended as such, and may neither make the occupation unlawful when the tax is not paid, nor regulate the occupation, nor confer any privilege upon persons engaged in the occupation. Globe Security &*

*Loan Co.* v. *Carrel* (1922), 106 Ohio St. 43, 49. Thus, an occupation tax for revenue purposes is clearly differentiated from a *license* "tax" which *does*, by definition, make an occupation unlawful when the license fee is not paid.

The *Globe case* illustrates the type of occupation ordinance which is *not* a license. The ordinance involved brokers of various types, requiring that an annual tax be paid to the municipality by anyone engaged in the occupation. According to the petition of the plaintiff in that case, one paragraph of the ordinance provided:

" 'Brokers' (chattel mortgages)—every person, association of persons, firm or corporation engaged in the business of lending or advancing money (or negotiating for the loan or advance of money) or by securing chattels or by a mortgage [*sic*] shall pay an annual tax of one hundred ($100) dollars. Also,

"'* * *.'"

It is noted that the expressed intent of the ordinance had been "to levy an annual occupational tax upon persons, * * * carrying on certain trades * * * in the city of Cincinnati * * *." The court properly interpreted this as merely an excise tax, and not a license.

We do not deny that a city may impose either a license fee or an excise tax on occupations carried on, and privileges exercised, within its jurisdiction. Nor are we unaware that an ordinance which purports to impose a license fee may actually be levying an excise tax, which is a valid exercise of a municipality's general power of government, just as the license is a valid exercise of its police power.

However, when, as in this case, a purported licensing ordinance is so arbitrary and discriminatory in its classification, and so unreasonable in the amount of the license fee, as to be incapable of justification under the police power, and when the municipality expressly admits that the ordinance is not, and was not intended to be, a tax for general revenue purposes, the courts cannot, *sua sponte*, elect to view the ordinance as a valid exercise of the municipality's taxing power.

The ordinance under which defendant was convicted

is unconstitutional as a licensing ordinance because it is wholly out of proportion to any burden imposed upon the municipality by the licensed activity, and because it discriminates against one form of activity which bears no greater relation to the evils sought to be prohibited than do other activities which are not licensed. The ordinance is incapable of classification as a taxing ordinance.

For the foregoing reasons, the judgment of the trial court is reversed, and final judgment entered for defendant appellant.

*Judgment reversed.*

CORRIGAN and DAY, JJ., concur.