[No. 24637.   *En Banc.*   September 8, 1933.]

THE STATE OF WASHINGTON, *on the Relation of Will T. Stiner, Plaintiff,* v. CLIFF YELLE, *as State Auditor, Respondent.*[1]

[1]Reported in 25 P. (2d) 91.

*Yantis & Brodie,* for relator.

*The Attorney General* and *John W. Hanna, Assistant,* for respondent.

*Wright, Jones & Bronson, Grinstead, Laube, Laughlin & Meakim,* and *E. W. Anderson, amici curiae.*

TOLMAN, J.—This is an action instituted in this court for the purpose of testing the constitutionality of chapter 191, Laws of 1933, p. 869 [Rem. 1933 Sup., § 8326-1 *et. seq.*], imposing a tax on the privilege of engaging in business in this state. Relator seeks a writ of mandate to compel the respondent, as state auditor, to honor a voucher duly presented for services rendered by him at the behest of the state tax commission in forwarding its preparations to administer the act. The auditor refuses to recognize the voucher upon the ground that the act is unconstitutional. Hence, we have here only the one broad question as to the constitutionality of the act as a whole. No lesser or minor questions as to the reasonableness of the several classifications, as to the difference in rates as between the classes, or any other such question has been presented to us, and no such question is to be pre-judged by anything here said.

Without entering into a history of conditions giving rise to this legislation, it is sufficient to say that the legislature was confronted by a situation of the utmost gravity requiring the prompt and effective raising of much additional revenue and making necessary the placing of a heavy tax burden upon every available source from which taxes might legally be drawn, or from which revenue might be derived, without causing more harm and loss than the depressed state of industry could bear. Faced with this situation, chapter 191 was enacted, which is entitled:

"An Act relating to taxation; imposing taxes upon the privilege of engaging in business activities and providing for the ascertainment, assessment, collection and distribution thereof; providing for the administration and enforcement of this act; providing penalties; making appropriations; and declaring that this act shall take effect immediately."

Section one of the act contains definitions of certain of its terms, one or two of which will be set out and referred to as we proceed.

Section two (p. 871) provides:

"From and after the first day of August, 1933, and until the thirty-first day of July, 1935, there is hereby levied and there shall be collected from every person an annual tax or excise for the privilege of engaging in business activities. Such tax or excise shall be measured by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, as follows: . . ." [Rem. 1933 Sup., § 8326-2.]

Then follows the legislative classification of business into some twenty general classes, several of which are subdivided and subjected to different rates. The act, by reason of the governor's veto, had eliminated from it, when it finally became a law, those engaged in agriculture, using the term in its broad sense, and also those engaged in rendering services, professional or otherwise, and it is upon the omission of those classes, and others, if any such there be, from the act that the argument as to its unconstitutionality is now based.

The *Attorney General,* and the friends of the court appearing in defense of the action, appear to rely primarily upon the 14th amendment to the Federal constitution; § 3 of Art. I of the state constitution, which is to the same effect and provides, "No person shall be deprived of life, liberty, or property without due process of law;" Art. I, § 12, of the constitution,

which forbids special privileges or immunities; and Art. VII, § 1, being the 14th amendment to the state constitution, which provides:

"The power of taxation shall never be suspended, surrendered or contracted away. All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax and shall be levied and collected for public purposes only. The word 'property' as used herein shall mean and include everything, whether tangible or intangible, subject to ownership. All real estate shall constitute one class: *Provided,* That the legislature may tax mines and mineral resources and lands devoted to reforestation by either a yield tax or an *ad valorem* tax at such rate as it may fix, or by both. Such property as the legislature may by general laws provide shall be exempt from taxation. Property of the United States and of the state, counties, school districts and other municipal corporations, and credits secured by property actually taxed in this state, not exceeding in value the value of such property, shall be exempt from taxation. The legislature shall have power, by appropriate legislation, to exempt personal property to the amount of three hundred ($300.00) dollars for each head of a family liable to assessment and taxation under the provisions of the laws of this state of which the individual is the actual bona fide owner."

In the light of the constitutional provision, just quoted, it seems necessary first to determine whether the tax under consideration is a property tax or an excise tax, because of the uniformity clause which applies specifically to each class of property.

Relator, of course, bases his application upon the idea that this is an excise tax pure and simple, while the *Attorney General* and some of the friends of the court defending, though not so conceding, appear by the arguments presented to anticipate that we must so hold. Yet another firm, appearing as *amici curiae,* does argue this question extensively.

Time and space will not permit a review of the authorities on this question. Slight differences in the terms of the acts considered, or in constitutional provisions, have led to a maze of conflicting and bewildering decisions. It may be that we have, in some prior case, used language not wholly consistent with our present views. After an exhaustive study of the cases, we are well satisfied that this is not a property tax, even under the broad and all inclusive terms of our constitution. To hold otherwise would render it exceedingly difficult if not impossible to sustain any excise tax.

It is true that the constitution defines property as anything subject to ownership and, in a sense, one's business and its earnings are owned by him, but the privilege of engaging in business and gainful pursuits under the protection of our laws is something which must and does exist before the business can be established, and something far and away beyond and above the mere ownership of a business. Man in a state of nature gained his sustenance by his strength or cunning, or both, and that which he so gained might, and no doubt often was, taken from him before he could use and enjoy it by someone stronger and more cunning. Hence, the established state enacted laws for the protection of human rights, the rights of property, and to prevent the weak or the credulous from becoming the helpless victims of the force or fraud of the strong and the cunning.

Peace officers and courts, among many other things, were established to this end, and every citizen is now measurably safe in pursuing any gainful occupation with the expectation that he will be by the state fully protected and made secure in his property investment, and also in his gains therefrom. This is the privilege, far above mere property, which it is now sought to tax

to the end that it may pay, in some part, its fair share of the cost to the state of its creation and continuance.

Income may be acquired, but only in exceptional cases, such as annuities and the like, is it susceptible of ownership. When acquired, income immediately becomes property in the hands of the acquirer, and it is, of course, taxable with other property of the same class.

This act does not concern itself with income which has been acquired, but only with the privilege of acquiring, and that the amount of the tax is measured by the amount of the income in no way affects the purpose of the act or the principle involved.

Among other authorities bearing upon the question which support our view, we refer only to the following few: *Southern Railway Co. v. Watts,* 260 U. S. 519; *Lawrence v. State Tax Commission,* 286 U. S. 276, and our own cases of *Pacific Tel. & Tel. Co. v. Seattle,* 172 Wash. 649, 21 P. (2d) 721; *Puget Sound Power & Light Co. v. Seattle,* 172 Wash. 668, 21 P. (2d) 727; *Bucoda v. Swaney,* 163 Wash. 43, 299 Pac. 652; *Sumner v. Ward,* 126 Wash. 75, 217 Pac. 502, and prior cases therein cited. These seem sufficient to decisively determine that we are now dealing with an excise tax and not with a tax on property.

This being an excise tax, the legislature, under the 14th amendment to our state constitution, has very broad power, and we cannot interfere with that power except for arbitrary action, clear abuse, or constructive fraud appearing on the face of the act or from facts of which we may take judicial knowledge.

"A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is neither capricious nor arbitrary, and

rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law." *Brown-Forman Co. v. Kentucky,* 217 U. S. 563.

See, also, *Tax Commissioners v. Jackson,* 283 U. S. 527, 73 A. L. R. 1464; *Miethke v. Pierce County,* 173 Wash. 381, 23 P. (2d) 405; and *State v. Hart,* 125 Wash. 520, 217 Pac. 45.

Having this rule at all times in mind, let us look at the act for any evidence of capricious or arbitrary action.

In the first place, and to clear away immaterial matters, it should be said that the governor's veto of parts of the measure now means nothing whatsoever. In exercising the veto power, the governor acts as a part of the legislative bodies, and the act is to be considered now just as it would have been if the vetoed provisions had never been written into the bill at any stage of the proceedings.

We have, then, a measure which evidences the purpose to tax the privilege of carrying on those businesses which are, in a broad sense, commercial in their nature, buying for resale at a profit, producing for sale, transporting and financing for profit (which are recognized as an important part of production), and all like enterprises which look to the purpose of bringing usable commodities of various sorts into the hands of the ultimate consumer. These commercial businesses are peculiarly dependent upon the state for protection in order that they may be carried on successfully, and they, more than all others, are responsible for, and receive the benefit of, that which the state expends in maintaining peace and order and the safety of private property.

In the many classes and subclasses are included, presumably, all occupations which, to the legislative

knowledge, are so far motivated by the commercial spirit as to make them properly taxable; and, in the arguments addressed to this court, no omissions have been suggested save only those engaged in agricultural pursuits and those rendering personal or professional services.

To accent the argument that these omissions are fatal to the act, great stress is laid upon the definition of "business" contained in subdivision (7) of § 1 of the act. That definition is:

"The word 'business' shall include all activities engaged in with the object of gain, benefit or advantage either direct or indirect, and not excepting sub-activities producing marketable commodities used or consumed in the main business activity, each of which sub-activities shall be considered business engaged in taxable in the class in which it falls." [Rem. 1933 Sup., § 8326-1.]

But we see nothing in this definition which affects the situation in any degree, or at all. The definition is used to define "business" as the word is used in the act; and wherever the word "business" is used in the act, in all its several classes and subdivisions, it is intended to include all activities engaged in for the purpose of gain coming under each such class or subdivision. Of course, the legislature was not engaged in the idle task of defining words not used in the act or for purposes not contemplated by the act. And when the definition is applied to the act itself, it broadens each class and subdivision so as to cover all those activities which should come within that class or subdivision. Consequently, as we see it, the legislative definition has nothing whatever to do with any business or occupation not made taxable by the act.

Keeping in mind, then, the broad purpose of the act to tax those engaged commercially, it would seem that

the exclusion of those engaged in agriculture is a most proper one. Farming is not a commercial pursuit. It is not a business in the sense used in this act. By general knowledge and common consent, farming is classed as a way of life by means of which, in more prosperous times, the farmer gained a modest livelihood with security and, perhaps, some financial gain from the rise in land values which might enable him to provide a measure of comfort for his old age. Except in the rare instances of the so-called bonanza farms, no farmer has ever been expected to amass a fortune or even any considerable competency as a result of his productive labors. If this state ever had anything approaching the bonanza farm, recent years have annihilated it completely and it is common knowledge that the farmers of the state do not even earn laborer's wages for the hours they are employed.

Moreover, the farmer's products, except some minor items like fresh fruit and vegetables, do not enter largely into the stream of commerce until after they have left his hands and are processed in some manner. The farmer's wheat goes to the mill to be made into flour. His livestock goes to the packing house to be turned into merchantable meat. All who buy from the farmer for the purpose of processing and merchandising come under the act and are properly taxed, because the commercial element enters when they purchase the farmer's product from him, and not until then is that product in any fair sense within the spirit of this act. Moreover, the farmer cannot pass the tax to the ultimate consumer, while all those later dealing with his products, like all others engaged in commercial pursuits, may and probably will very largely do so.

Agriculture, therefore, lacking the commercial element which is the very essence of the act, was properly excluded.

Much the same is true of those rendering services, professional and otherwise. It needs no argument to demonstrate that the wage earner is properly excluded, and that upon no theory can he be classed with those engaged in business. To tax him for the privilege of being employed would be out of harmony with the spirit of the act, and if such a tax would be collectible, it would necessarily have to be deducted at the source, and under present conditions, when the wage earner is barely subsisting, the tax would have to be paid by the employer and would thus subject him to double taxation under the act.

To one who has long followed a profession, the reason for the exclusion of professions seems equally clear. While there may be those who commercialize the professions, the rule to the contrary is very strict, and it is, we trust and believe, generally obeyed by those in the professions. A profession is not a money getting business. It has no element of commercialism in it. True, the professional man seeks to live by what he earns, but his main purpose and desire is to be of service to those who seek his aid and to the community of which he is a necessary part. In some instances, where the recipient is able to respond, seemingly large fees may be paid, but to others unable to pay adequately, or at all, the professional service is usually cheerfully rendered. But whether so or not, the commercial spirit which runs through this act is wholly condemned by the ethics of every profession of which we have judicial knowledge; and if there be violations and abuses, those should be cured, rather than that the whole of those engaged in professional service be stamped with the brand of commercialism and taxed accordingly.

The *Attorney General* relies very largely on a decision by the supreme court of Illinois in the case of

*Winter v. Barrett,* 186 N. E. (Ill.) 113, recently decided.
As we see it, the Illinois act there under consideration
greatly differs from our act. The title of the Illinois
act reads:

"An act in relation to a tax upon persons engaged
in the business of selling tangible personal property at
retail, the disposition thereof and making certain ap-
propriations in connection therewith."

The act was held bad by the Illinois court because it
excluded certain classes actually engaged in the busi-
ness of selling tangible personal property at retail.
Among other things, the Illinois court said:

"It will be observed, however, that this act does not
purport to be a tax upon the butcher, the baker, or like
occupations, as such, to the exclusion of those engaged
in other occupations. There is created but one class
to whom the tax is to be applied, and that class is 'per-
sons engaged in the business of selling tangible per-
sonal property at retail.' There is in this provision
no limitation upon the word 'persons,' and it must be
construed to include all persons engaged in such busi-
ness; the only exemption therefrom being inferred by
the above quoted language of the statute declaring that
certain property shall not be included within the mean-
ing of the term 'tangible personal property'."

The title of the act and this quotation seem to in-
dicate, to some extent, the difference between the
Illinois act and our own. This opinion is already over-
long, and cannot be extended by a detailed discussion
of the Illinois act and the Illinois decision. Suffice it
to say that we have carefully considered the decision
and the terms of the act as therein disclosed, and feel
quite confident that the Illinois decision is not author-
ity for holding our act to be unconstitutional. But,
even if it be, our confidence in the soundness of our
present views, even though inadequately expressed, is

such that, greatly as we respect the Illinois court, we must refuse to follow it.

The state is facing stark necessity. The legislature has earnestly endeavored to meet this critical situation. This law is, perhaps, not perfect. No tax law yet devised has been entirely fair and just to all in its practical workings. This is an emergency measure, limited by its terms to a two-year period. If it works injustice to some, it will be but temporary, and such temporary injustice, if any, must be borne for the common good.

The act does not offend against either the Federal or the state constitution.

The permanent writ will issue as prayed for.

BEALS, C. J., HOLCOMB, BLAKE, and GERAGHTY, JJ., concur.

STEINERT, J. (dissenting)—The question before us is whether the so-called ''occupation tax'' act, adopted by the 1933 legislature, is constitutional or unconstitutional.

. The title of the act, chapter 191, Laws of 1933, p. 869 [Rem. 1933 Sup., § 8326-1 *et seq.*], reads as follows:

''AN ACT relating to taxation; imposing taxes upon the privilege of engaging in business activities and providing for the ascertainment, assessment, collection and distribution thereof; providing for the administration and enforcement of this act; providing penalties; making appropriations; and declaring that this act shall take effect immediately.''

It is conceded by all that the purpose of the act is to raise additional revenue to meet the deficit occasioned by the general economic depression. It is in no sense a regulatory statute.

Inasmuch as any discussion of the matter must make frequent reference to the terms ''gross income,''

"business" and "gross proceeds of sales," we may as well have before us the legislative definitions of those terms.

Section 1 (6) of the act reads:

"The term 'gross income' means the value proceeding or accruing from the *sale of tangible property, real or personal, or service or both,* and all receipts, actually received by reason of the investment of the capital of the business engaged in, including interest, discount, rentals, royalties, fees or other emoluments however designated and without any deduction on account of the cost of property sold, the cost of materials used, labor costs, interest or discount paid or any other expenses whatsoever and without any deduction on account of losses: Provided, The term 'gross income' shall not include any payments received on accounts or notes outstanding at the time this act goes into effect." (Italics mine.)

Section 1 (7) of the act reads:

"The word 'business' shall include *all activities engaged in with the object of gain, benefit or advantage either direct or indirect,* and not excepting sub-activities producing marketable commodities used or consumed in the main business activity, each of which sub-activities shall be considered business engaged in taxable in the class in which it falls." (Italics mine.)

Section 1 (8) of the act reads:

"The term 'gross proceeds of sales' means the value proceeding or accruing from the sale of property without any deduction on account of the cost of property sold, expenses of any kind, or losses."

Closely associated with the term "business" is the correlative term "business activities."

Section 2 (1) of the act reads:

"Business activities, for the purpose of this act, are hereby declared to consist of the five separate and distinct functions, to wit:

(a) The extractive function;
(b) The manufacturing and/or producing function;

(c)  The wholesaling and/or jobbing function;
(d)  The function of retail distribution;
(e)  The function of performing and rendering services.

"The taxes hereinafter imposed shall apply to *all business activities within the state and to each function thereof,* whether carried on separately or in combinations of two or more functions." (Italics mine.)

Section 2 (2) of the act reads:

"From and after the first day of August, 1933, and until the thirty-first day of July, 1935, there is hereby levied and there shall be collected *from every person an annual tax or excise for the privilege of engaging in business activities.* Such tax or excise shall be measured by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, as follows:  . . . "  (Italics mine.)

Then follow various sub-classifications of the five main functions of business activities and the designation of specific rates to be paid by each, measured by their gross proceeds of sales or their gross income. Included within the extractive function are the pursuits devoted to agriculture and horticulture.

Section 2 (2) (a) VII (ba) reads as follows:

"Upon every person engaging or continuing within this state in the business of growing or raising for sale, profit or use, any article, substance, commodity, product, or crop; as to such person, the amount of the tax or excise shall be equal to the value of the articles, substances, commodities, products or crops produced, grown, or raised for sale, as shown by the proceeds derived from the sale thereof by the grower, raiser or producer (except as hereinafter provided) multiplied by the rate of one-tenth of one per cent."

This section was vetoed by the governor of the state.

Section 2 (2) (b) of the act, which is the omnibus provision, reads as follows:

"Upon *every person* engaging in or continuing within this state in *any business not included in the*

*preceding subdivisions of this section and upon every person engaging or continuing within this state in the business of rendering, performing or selling services, professional or otherwise;* as to such persons the amount of the tax or excise shall be equal to the gross income of the business multiplied by the rate of six-tenths of one per cent." (Italics mine.)

This section was also vetoed by the governor.

From a reading of the foregoing sections it is apparent that it was the intent that every person engaged in any activity with the object of gain should be taxed according to his gross income.

Inasmuch as the constitutionality of a particular statute must depend upon the particular constitution which it either observes or offends, we must needs have before us the provisions of our own constitution which affect the question.

The fourteenth amendment of our constitution, adopted in November, 1930, so far as it is pertinent here, reads as follows:

"All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax and shall be levied and collected for public purposes only. The word 'property' as used herein shall mean and include *everything, whether tangible or intangible, subject to ownership."* (Italics mine.)

There are, of course, many decisions by the courts of other states touching the validity of income tax acts passed by their respective legislatures. Those decisions range themselves into two classes, one holding that income is property within the meaning of the statute, the other holding that it is not, but is rather a tax on the privilege of *earning* an income. But in order properly to evaluate any particular decision, it is always necessary to have in mind the constitutional provision behind it. The rock upon which the courts

split, and upon which the members of a particular court often divide, is, as already indicated, the question whether income is, or is not, property. There is no state, with the possible exception of Montana, that has a constitution containing language comparable in character to our constitution upon that specific phase of the question. · Art. XII, § 17, of the Montana constitution provides:

"The word property as used in this article is hereby declared to include moneys, credits, bonds, stocks, franchises and all matters and things (real, personal and mixed) capable of private ownership, but this shall not be construed so as to authorize the taxation of the stocks of any company or corporation when the property of such company or corporation represented by such stocks is within the state and has been taxed."

Speaking of that provision, the Montana court said in *Cruse v. Fischl,* 55 Mont. 258, 175 Pac. 878, at 880:

"We imagine that it would defy the ingenuity of the most profound lexicographer to formulate a more comprehensive definition . . . "

If this were a challenge to other states to formulate a more comprehensive definition, it seems to me that the state of Washington has met it when it declared that "property" shall include everything, tangible or intangible, subject to ownership. The constitution of this state, so far as it bears upon the characterization of property, is *sui generis.*

I am aware that, in a recent decision by the supreme court of Montana, an income tax law passed by the legislature of that state was held valid. *O'Connell v. State Board of Equalization,* 25 P. (2d) (Mont.) 114. This court, however, has recently criticized the holding in that case, and has expressly refused to follow it. *Culliton v. Chase, ante* p. 363, 25 P. (2d) 81.

If the question before us were simply whether in-

come is, or is not, property, the answer has already been definitely supplied by this court. In *Aberdeen Savings & Loan Assn. v. Chase*, 157 Wash. 351, 289 Pac. 536, 290 Pac. 697, 71 A. L. R. 232, an *En Banc* decision, we held that net income is property. In that case, the respondents contended that the tax provided for in the statute was an excise for the privilege of doing business. Addressing itself to the recital of the statute, the court in its opinion said:

"Such a legislative declaration is to be carefully considered by the courts and due weight given thereto. Courts should, however, in construing an act containing such a declaration, consider the true operation and effect of the law which must be dealt with on the basis of the practical results which follow its operation, and not alone by legislative declarations contained therein."

The particular case arose upon a net income tax act, but the opinion stated that there was no distinction in principle between a tax on gross receipts and a tax on net income.

Upon a rehearing of the case, this court declared itself as follows (p. 392):

"In order to clarify the situation, the court now states that the opinions above cited were rendered with a view to determining the questions presented by the cases at bar, and those questions only; that the majority of the court was of the opinion that the legislation therein attacked must be held, under the decisions of the supreme court of the United States, to attempt to establish a property and not an excise or corporation franchise tax; . . ."

In *Burr, Conrad & Broom, Inc. v. Chase*, 157 Wash. 393, 289 Pac. 551, which was a companion to the *Aberdeen Savings & Loan* case, we said:

"We are convinced that, notwithstanding the legislative declaration, the tax is not, in truth and in fact,

an excise or corporate privilege tax, and, this being the case, we find no justification for any such discrimination between corporations and individuals or co-partnerships, which, under the circumstances presented by the record in this case, must be held to be merely an arbitrary classification.''

In *Spokane & Eastern Trust Co. v. Spokane County,* 70 Wash. 48, 126 Pac. 54, Ann. Cas. 1914B 641, we said:

''An excise tax is a tax upon a pursuit, trade or occupation . . . 3 Words and Phrases, 2548. Where the charge is imposed solely or primarily as a means of raising revenue, it is a property tax.''

Those cases are conclusive, so far as our decisions are concerned, in establishing the nature of the tax and also the nature of the subject of the tax. A tax based upon gross income or gross proceeds of sales is a property tax.

Subsequent to the decision of the *Aberdeen Savings & Loan Assn.* case, our constitution was amended. The amendment, however, fortifies the conclusion reached in that case. Our present constitution, in providing for a uniformity of tax upon the same class of property, defines property as everything, tangible or intangible, subject to ownership. So that the immediate question now before us is whether ''gross income'' or ''gross proceeds of sales'' is *subject to ownership.*

The relator contends that ''income is capable of *acquisition,* but except in a very limited number of cases, is not capable of ownership.'' According to this statement, income seems to partake of the nature of a globule of mercury, which one can hold in his hand, but on which he can never fasten his thumb. By this formula, the grocer owns his stock of goods while it is on the shelf, but when he converts it into cash he does not own the proceeds; if he banks the money, it

is not his money that he banks; if some one steals it, he is not guilty of larceny.

I presume that the proponents of that theory would draw a distinction between "gross income" or "gross proceeds of sales" and the money equivalent thereof. The distinction, however, seems to me to be too tenuous and too barren of reason to be of any value in solving so material and practical a matter as the ever-present subject of taxation. In fact, it seems to me that any such tenuous distinction, if it exists at all, is fully met by the choice of language contained in our constitution. Its framers avoided the possibility of income being declared not to be property in its common acceptation, by defining the word "property" as meaning and including everything subject to ownership. If there are any words more comprehensive than these, they do not occur to me.

If I am correct thus far, then it must follow, and I do not believe that the contrary is seriously contended, that the act fails because it lacks the element of uniformity prescribed by the constitution. Paraphrasing the fourteenth amendment, its mandate is that when *anything* subject to ownership is taxed, it must be taxed at the same rate at which everything else of the same class is taxed. "Gross income" or "gross proceeds of sales" is a class of itself. Its sources may vary, the net profits resulting therefrom may be large in one instance and small in another, but, of itself, it is a single classified concept. The "gross proceeds of sales" of the manufacturer may exceed those of the merchant; the "gross income" of either may result from mathematical computations different from those employed by the professional man; but the terms themselves have one and an identical meaning when applied to each. By the act itself, they mean the value proceeding or accruing from the sale of property or

services or both, without deduction of cost, expense or loss.

I now approach the matter from another angle. Art. I, § 12, of our constitution provides:

"No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

By the governor's veto, there was written into the act an exemption in favor of farmers, professional men, salaried persons, wage-earners, landlords, mortgage loan houses, and all others who would otherwise have been classed under the omnibus clause. The act, as it passed the legislature, expressly declared its intent to tax all persons engaged in any activity with the object of gain, benefit or advantage, direct or indirect. The language used was broad and sweeping, and its extent was all-inclusive. When the act finally emerged with the gubernatorial veto attached to certain portions of it, there had been deleted from it a portion of its very vitals. The act as originally adopted by the legislature indicates, on its face at least, a conscientious effort to relieve the dire necessities of the situation, by calling to the colors the assistance of all persons in the raising of certain revenues. As the act now stands, under the partial veto, we have a draft upon a selective class, or classes, while others are permitted not only to exempt themselves from its burdens, but even to enjoy the sacrifice made by those on whom the burden falls.

The purpose of the act is to enable government to function. Government functions for all. Why should some bear the burdens entailed by the limitation of the forty-mill limit act, which the present act is designed to supplement, and others merely enjoy that limita-

tion? Why should one class, or a series of classes, be called upon to support our system of education, even in part, while all others, who enjoy the full benefits of the system, are relieved of the burden to a proportionate extent? In my opinion, there is no valid reason.

Undoubtedly, the state has a wide latitude in selecting the subjects of taxation and in making classifications. *Brown-Forman Co. v. Kentucky,* 217 U. S. 563; *Tax Commissioners v. Jackson,* 283 U. S. 527, 73 A. L. R. 1464; *Miethke v. Pierce County,* 173 Wash. 381, 23 P. (2d) 405. This rule is subject, however, to the qualification that there must be a reasonable basis for the classification, and all persons within the same class must be taxed or exempted alike. *State v. Hart,* 125 Wash. 520, 217 Pac. 45, and cases therein cited. Stated in another way, the classification must be reasonable and germane to the objects and purposes of the legislation. *McKnight v. Hodge,* 55 Wash. 289, 104 Pac. 504, 40 L. R. A. (N. S.) 1207; *Maercker v. Milwaukee,* 151 Wis. 324, 139 N. W. 199, L. R. A. 1915F 1196, Ann. Cas. 1914B 199; Cooley on Taxation, p. 719.

The present tax is an "occupation tax." It assumes, by its title and by its provisions, to enforce upon every person an annual tax for the privilege of engaging in business activities. Viewed from its profile, the act has the appearance of being a complete entity; viewed from its front, we see that half of it is gone. The veto effected a mutilation of the act and robbed it of sufficient of its vitality to prevent it from accomplishing the purpose for which it was conceived. As it now stands, the act presents a classification that is unreasonable and arbitrary, discriminatory in its nature, and taking no thought of relative ability to pay, or the relative enjoyment of govermental privileges conferred.

Coming now to the leading opinion, I have but one or two things to say. I do not believe that either the farmer or the professional man should be exempt from the occupation tax, and certainly not the landlord, the mortgage-loan company, or even the salaried person.

With respect to the farmer, it is undoubtedly true that in recent years he has earned hardly more than laborer's wages for the hours employed. But it seems to me that the remedy for this is by other means, some of which have already been employed, and others of which our national government is even now endeavoring to effect. The farmer is not a pensioner, and I do not think that he desires to be considered as such. He does not desire a mere sop to be thrown to him in alleviation of a condition that he must otherwise continue to bear. What he needs, and what he desires, is that conditions be so radically changed that he may justly receive that which he is entitled to for his labor and his products. Until that is done, he will receive but little aid, and small comfort, from a mere exemption from some particular tax.

As to the professional man, there is even less reason for exemption as to him. Granted that he sometimes receives small fees, and at other times none, for the service that he nevertheless cheerfully performs, that is no answer to the question before us. Many a grocer, butcher or baker has sold supplies from his shelf for which he has never been paid, and is extending credit to those who may never pay the bill. The fact that he may at times contribute the necessities of life to the hungry would offer no logical reason for exempting him from the tax. When it comes to the question of who is really affluent, or successful, in these times, I doubt whether the merchant can show any better returns than the professional man or the salaried class. The purpose of the occupation tax act certainly is not

to stigmatize those who are engaged in strictly commercial pursuits, nor to exalt and exempt a profession merely because it maintains a code of ethics.

What I have said with reference to the professional man applies equally to the landlord, the mortgage-loan company and even the salaried man. Taken as a whole, those included in the exempted classes are numbered by the thousands. They are all engaged in business activities. They each have an occupation from which a gross income may be realized. If, in fact, the gross income of any be small, then the amount of tax to be paid by them will likewise be small and its payment will entail but a slight burden as to them. If, on the other hand, the gross income of any be large, then it furnishes not only a basis, but also a reason, for a proportionate contribution by them to the revenue sought to be raised.

We have here only a practical, every-day question, one that, because of its necessity, we must recognize. It is the question of taxation, the means provided for the maintenance of government. It may be a rendering "unto Caesar the things that are Caesar's," but since, and so long as, the state is dependent thereon, it must be rendered. The only amelioration that it can have is that it be fairly and equally distributed and borne.

I think that the act in question is clearly unconstitutional, and therefore dissent.

MITCHELL, J., concurs with STEINERT, J.

MAIN, J. (dissenting)—In my opinion, the tax in question is an excise and not a property tax within the contemplation of the fourteenth amendment to the constitution of this state.

Judge Steinert's dissenting opinion may be said to be divided into two parts. With the first, I do not

agree. With the second, I am in accord. I concur in that part of the opinion beginning with the sentence, "I now approach the matter from another angle," and continuing to the end thereof. For the reasons stated in that part of the opinion, I dissent.

MILLARD, J., concurs with MAIN, J.